13 CV 7976

RECEIVED
NOV 0 8 2013
U.S.D.C. S.D. N.Y.
CASHIERS

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

FUND LIQUIDATION HOLDINGS LLC,
Individually and on Behalf of All Those Similarly Situated,

        Plaintiff,

    vs.

JPMORGAN CHASE & CO., CITIGROUP, INC.,
CITIBANK, N.A., THE GOLDMAN SACHS GROUP,
INC., HSBC HOLDINGS PLC,  HSBC BANK, PLC,
HSBC BANK USA, N.A., BANK OF AMERICA
CORPORATION, BARCLAYS BANK, PLC, BNP
PARIBAS S.A., CREDIT SUISSE GROUP AG,
DEUTSCHE BANK AG, MORGAN STANLEY BANK,
N.A., THE ROYAL BANK OF SCOTLAND GROUP
PLC, UBS AG, UBS SECURITIES, LLC, MARKIT
GROUP, LTD. AND THE INTERNATIONAL SWAPS
AND DERIVATIVES ASSOCIATION,

        Defendants.

Civil Action No.

**CLASS ACTION COMPLAINT
FOR VIOLATION OF THE
ANTITRUST LAWS**

**JURY TRIAL DEMANDED**

Andrew J. Entwistle, Esq.
Vincent R. Cappucci, Esq.
Robert N. Cappucci, Esq.
**ENTWISTLE & CAPPUCCI LLP**
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200

Robert N. Kaplan, Esq.
Gregory K. Arenson, Esq.
Richard J. Kilsheimer, Esq.
Matthew P. McCahill, Esq.
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Ariana J. Tadler, Esq.
Peggy J. Wedgworth, Esq.
Paul F. Novak, Esq.
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 946-9453

Reed R. Kathrein, Esq.
Steve Berman, Esq.
Jason A. Zweig, Esq.
**HAGEN BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

*Attorneys for Plaintiff Fund Liquidation Holdings LLC*

EC.53565.1

## **TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     JURISDICTION AND VENUE.............................................................4

III.    PARTIES ...............................................................................................4

        A.      Plaintiff................................................................................4

        B.      The Dealer Defendants ........................................................5

        C.      Non-Dealer Defendant Markit...............................................11

        D.      Non-Dealer Defendant ISDA ................................................11

IV.     NON-PARTY CO-CONSPIRATORS
        INTERCONTINENTALEXCHANGE, ICE CC AND MARKITSERV..............12

V.      OTHER AGENTS AND CO-CONSPIRATORS.....................................14

VI.     FACTUAL BACKGROUND.................................................................15

        A.      Credit Default Swaps And The Operation Of The CDS Market...............15

        B.      Lack Of Regulation In The CDS Market And The Lack Of Market
                Transparency ....................................................................16

        C.      The Dealer Defendants' Control Over The CDS Market...........................20

VII.    DEFENDANTS' WRONGFUL CONDUCT.........................................21

        A.      The Dealer Defendants Conspired To Inflate CDS Spreads ....................21

                1.      Overview of Wrongdoing Alleged ................................21

                2.      The Dealer Defendants Control Trading and Information in
                        the CDS Market ..............................................22

                        a.      The Dealer Defendants Control The Dissemination
                                Of CDS Trading Information Through Defendant
                                Markit ..............................................22

                        b.      The Role Of The DTCC And Co-Conspirator
                                MarkitSERV ........................................23

                        c.      The Role Of Defendant ISDA ...........................25

EC.53565.1

          d.     The Dealer Defendants Dominate Co-Conspirator ICE CC, The Primary CDS Clearinghouse ........................26

   B.    Government Investigations.........................................................................29

       1.    Department of Justice Investigation of Anticompetitive Conduct in the CDS Market .........................................................29

       2.    The EC's Investigation of Anticompetitive Conduct in the CDS Market.......................................................................................30

VIII.   CLASS ALLEGATIONS .............................................................................32

IX.    TRADE AND COMMERCE ......................................................................34

X.     FRAUDULENT CONCEALMENT .............................................................35

COUNT I  Against All Defendants For Violation Of Section 1 Of The Sherman Act ...................................................................................................................35

PRAYER FOR RELIEF ..............................................................................................37

DEMAND FOR JURY TRIAL ....................................................................................39

EC.53565.1

Plaintiff Fund Liquidation Holdings LLC ("Plaintiff" or "FLH") as assignee of (1) Brookville Opportunities Fund, L.P. ("Brookville") and (2) Sonterra Capital Master Fund, Ltd. ("Sonterra") (collectively, the "Funds"), individually and on behalf of a Class consisting of Plaintiff and all those similarly situated, brings this action for damages and injunctive relief under the antitrust laws of the United States against the Defendants identified below.  Plaintiff alleges on information and belief as follows:

## I.   **INTRODUCTION**

1.    Plaintiff brings this antitrust class action on behalf of all persons and entities who purchased or sold credit default swaps ("CDS") directly from or to the Dealer Defendants named below in the United States and its territories, or for delivery in the United States or its territories, during the Class Period, defined as January 1, 2008 until such time as the Defendants' illegal conduct ceased.

2.    There are two groups of CDS market participants whose misconduct forms the basis of Plaintiff's allegations.  The first group, the Dealer Defendants, is made up of a number of large multinational banks – acting as dealers, buying and selling CDS in the over-the-counter ("OTC") market – that collectively control more than 99 percent of the U.S. CDS market.  The second group of market participants is a number of standard-setting and data entities that are owned, controlled or otherwise dominated by the Dealer Defendants. These entities – Defendant Markit Group, Ltd. ("Markit"), Defendant the International Swaps and Derivatives Association ("ISDA") and alleged co-conspirators MarkitSERV, LLC ("MarkitSERV"), the IntercontinentalExchange, Inc. ("ICE") and ICE Clear Credit LLC ("ICE CC," whose "Risk Committee," made up of representatives from Dealer Defendants, dictates many of the rules governing CDS trading) – have actively participated in, or acted to facilitate, the Dealer

Defendants' anticompetitive scheme in the CDS market. The Dealer Defendants have long relied on their control or dominance of Defendants Markit and ISDA and co-conspirator ICE CC to put customers – those entities buying or selling CDS on the OTC market – at a distinct, and ultimately uncompetitive, disadvantage. In addition, the meetings of the boards of directors of Defendants Markit and ISDA, as well as of meetings of the Risk Committee of co-conspirator ICE CC and meetings of the board of directors of the Depository Trust & Clearing Corporation ("DTCC," which is neither a Defendant nor co-conspirator) give the Dealer Defendants ample opportunities to meet and exchange competitively-sensitive information.

3.     The Dealer Defendants include some of the world's largest banks, and they compete with each other in a number of settings (*e.g.*, issuing credit cards or attracting investment-banking clients). Yet, rather than compete in the U.S. CDS market, they agreed, along with Defendants Markit and ISDA, to illegally restrain trade and preserve their collusive control over the U.S. CDS trading market for the purposes of: (a) excluding potential competitors from that market through a number of anticompetitive actions and (b) maintaining artificially-inflated "bid/ask spreads" (referred to here as "spreads"), which is the difference between the price at which an entity is willing to buy a CDS for (the "bid" price) and the price at which an entity may be willing to sell a CDS (the "ask" price).

4.     The Dealer Defendants profit from the spread by selling a CDS at a price higher than the price at which they bought it. CDS buyers suffered injury by virtue of the Dealer Defendants paying less for the buyers' CDS contract than they would have in a truly competitive market; CDS sellers suffered injury when they sold their CDS contracts to the Dealer Defendants for less than they would have in a truly competitive market.

5.     As alleged more fully below, the Dealer Defendants agreed among themselves to artificially inflate and maintain the spreads paid by participants in CDS trading by, among other things: (a) establishing and controlling ICE CC, the largest CDS central clearinghouse that processes virtually all CDS trades in the United States; (b) obstructing the ability of sufficiently-capitalized CDS dealer competitors, such as smaller banks like State Street Corporation and Bank of New York Mellon, from becoming members of that clearinghouse; (c) limiting the availability of CDS trading data by excluding market participants, including investors and other actual or potential CDS dealers, from accessing CDS trading data; and (d) excluding potential entrants, including, but not limited to, MF Global, Inc. ("MFGI"), Eurex AG ("Eurex," run by Deutsche Börse) and the CME Group, Inc. ("CME") from establishing competing exchange platforms for CDS trading. The Dealer Defendants' agreements to collusively control the CDS market is manifested in the rules, regulations and by-laws of Defendants ISDA and Markit and co-conspirator ICE CC – all of which are dominated and/or controlled by the Dealer Defendants.

6.     Regulators in the United States and Europe are currently investigating collusion in the CDS market. The Antitrust Division of the U.S. Department of Justice ("DOJ") has confirmed that it is currently investigating anticompetitive conduct in the CDS market, and the probe is active and ongoing. On July 1, 2013, the European Commission ("EC," the European Union's antitrust regulator) issued a "Statement of Objections" (an official recitation of evidence of antitrust violations uncovered by the EC to date) against 13 banks (all of the Dealer Defendants, plus the former Bear Stearns, which is now part of Defendant JPMorgan Chase & Co.) as well as Defendants ISDA and Markit, for collusion in the CDS trading market.

## II.   JURISDICTION AND VENUE

7.   This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

8.   This Court has jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and 28 U.S.C. §§ 1331 and 1337.

9.   Venue is proper in this District pursuant to 15 U.S.C. § 15(a) and 28 U.S.C. § 1391(b), (c) and (d), because Defendants resided, transacted business, were found, or had agents in this District and/or the claims arose at least in part in this District.

## III.   PARTIES

### A.   Plaintiff

10.   **Plaintiff Fund Liquidation Holdings LLC**:  Plaintiff Fund Liquidation Holdings LLC is a Delaware Limited Liability Company, with its principal place of business at 100 Franklin St., 6th Floor, Boston, MA 02110.  FLH brings the claims asserted herein as assignee of the Funds pursuant to the terms of a valid assignment agreement between FLH and the Funds:

- **Brookville Opportunities Fund, L.P.**: Brookville is a Delaware limited partnership, with its principal place of business at Two Greenwich Plaza Greenwich, CT 06830.  During the Class Period, Brookville purchased CDS directly from, and sold CDS directly to, one or more of the Dealer Defendants named below.  In this regard, Brookville traded more than $3.8 billion in notional amounts of CDS.  Brookville paid and received over $207 million in connection with these transactions.

- **Sonterra Capital Master Fund, Ltd.**:  Sonterra is a Cayman Islands exempted company, with its principal place of business at 900 Third Avenue, 11th Floor New York, NY 10022. During the Class Period, Sonterra purchased CDS directly

from, and sold CDS directly to, one or more of the Dealer Defendants named below.  In this regard, Sonterra traded more than $1.57 billion in notional amounts of CDS.  Sonterra paid and received over $41.5 million in connection with these transactions.

11.   During the Class Period, the Funds traded over $5.4 billion in notional amounts of CDS.  The Funds paid and received over $248 million in connection with these transactions.

**B.   The Dealer Defendants**

12.   All of the Dealer Defendants listed below are part-owners of Defendant Markit, and all of the Dealer Defendants have been charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.  In addition, as shown in the following chart, all of the Dealer Defendants are currently represented on one or more boards of directors of entities that have either participated in the conspiracy (such as Defendants Markit and ISDA and co-conspirator ICE CC) and/or give these Dealer Defendants numerous opportunities to meet and exchange confidential information (such as the DTCC):

| Dealer Defendant | Represented on: | | | |
| --- | --- | --- | --- | --- |
| | Markit Board? | ISDA Board? | ICE CC Risk Committee? | DTCC Board? |
| J.P. Morgan Chase & Co. | Yes | Yes | Yes | Yes |
| Citigroup, Inc./Citibank, N.A. | | Yes | Yes | Yes |
| Goldman Sachs Group, Inc. | Yes | Yes | Yes | Yes |
| HSBC Holdings plc/HSBC Bank plc/HSBC Bank USA, N.A. | Yes | Yes | | |
| Bank of America Corporation | Yes | Yes | Yes | Yes |
| Barclays Bank Plc | | Yes | Yes | |
| BNP Paribas, S.A. | | Yes | | |
| Credit Suisse Group, AG | | Yes | Yes | |
| Deutsche Bank AG | | Yes | Yes | Yes |
| Morgan Stanley Bank, N.A. | Yes | Yes | Yes | Yes |
| Royal Bank of Scotland | | Yes | | |
| UBS AG/ UBS Securities, LLC | | Yes | Yes | |

13.    JPMorgan Chase & Co. ("Chase") is a Delaware corporation with its principal place of business in New York, New York. During the Class Period, Chase was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Chase, which essentially invented the credit default swap in the mid-1990s, annually trades trillions of dollars of notional amounts of CDS, and is (and has been throughout the Class Period) the largest CDS dealer in the United States. Chase is a part-owner of Defendant Markit and Chase representatives sit on Markit's board. Representatives from Defendant Chase also sit on the boards of the DTCC and Defendant ISDA, and Chase also has representatives on the ICE CC Risk Committee. In addition to being one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market, Chase has also disclosed that it is under investigation by American antitrust authorities for anticompetitive conduct in the CDS market.

14.    Defendant Citigroup, Inc. is a Delaware corporation with its principal place of business in New York, New York. Defendant Citibank N.A. is a wholly-owned subsidiary of Defendant Citigroup; Citibank maintains offices and transacts business in New York, New York. Defendants Citigroup and Citibank are referred to collectively as "Citi." During the Class Period, Citi was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Citi annually trades trillions of dollars of notional amounts of CDS in the U.S., and along with co-Defendants Chase, Bank of America and Goldman Sachs, is one of the four largest CDS dealers in the United States. Citi is a part-owner of Defendant Markit. Defendant Citi also has representatives serving on the boards of directors of the DTCC and Defendant ISDA, and has representatives on the ICE CC Risk Committee. In addition to being one of the 13 banks charged by European regulators with collusively blocking the entry of

exchange trading in the CDS market, Citi has also disclosed that it is under investigation by U.S. antitrust authorities for anticompetitive conduct in the CDS market.

15.   Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business in New York, New York.   During the Class Period, Goldman Sachs was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  Goldman Sachs is one of the four largest CDS dealers in the U.S. market, annually trading trillions of dollars of notional amounts in CDS.  Defendant Goldman Sachs is a part-owner of Defendant Markit and has a seat on its board of directors. Goldman Sachs is also represented on the boards of directors of the DTCC and Defendant ISDA, and is represented on the ICE CC Risk Committee.  In addition to being one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market, Goldman Sachs has also disclosed that it is under investigation by U.S. antitrust authorities for anticompetitive conduct in the CDS market.

16.   Defendant Deutsche Bank AG ("Deutsche Bank") is a German public company with its corporate headquarters in Frankfurt.  Deutsche Bank is an active dealer in the U.S. CDS market and maintains offices and transacts business in New York, New York.  During the Class Period, Deutsche Bank was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  Defendant Deutsche Bank is a part-owner of Defendant Markit. Deutsche Bank has representatives on the boards of the DTCC and Defendant ISDA, and is also represented on the ICE CC Risk Committee.  In addition to being one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market, Deutsche Bank has also disclosed that is under investigation by U.S. antitrust authorities for anticompetitive conduct in the CDS market.

17.   Defendant Morgan Stanley Bank NA ("Morgan Stanley") is an American financial services company headquartered in Purchase, New York.   During the Class Period, Morgan Stanley was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  Morgan Stanley is a part-owner of Defendant Markit and has a seat on its board of directors.  Defendant Morgan Stanley is also represented on the boards of directors of the DTCC and Defendant ISDA, and is represented on the ICE CC Risk Committee.  In addition to being one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market, Morgan Stanley has also disclosed that it is under investigation by U.S. regulators for anticompetitive conduct in the CDS market.

18.   Defendant Bank of America Corporation ("BAC") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  During the Class Period, BAC, along with its now wholly-owned subsidiary Merrill Lynch, was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  BAC annually trades trillions of dollars of notional amounts of CDS in the U.S., and along with co-Defendants Chase, Citi and Goldman Sachs, is one of the four largest CDS dealers in the United States.  Defendant BAC is a part-owner of Defendant Markit and has a seat on its board of directors.  BAC is also represented on the boards of directors of the DTCC and Defendant ISDA, and is represented on the ICE CC Risk Committee.  BAC is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

19.   Defendant HSBC Holdings plc ("HSBC Holdings") is a bank holding, U.K. public limited company with its principal place of business in London.  Defendant HSBC Bank plc ("HSBC UK") is a United Kingdom public limited company with its principal place of business in London. Defendant HSBC Bank USA, N.A. ("HSBC USA") is headquartered in McLean,

Virginia, with principal U.S. CDS trading operations located in New York City. Defendants HSBC Holdings, HSBC UK and HSBC USA are referred to collectively here as "HSBC." HSBC is an active dealer in the U.S. CDS market, primarily through its U.S. subsidiary, Defendant HSBC USA, and during the Class Period HSBC was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. HSBC is a part-owner of Defendant Markit, and has a seat on its board of directors. Defendant HSBC is also represented on the board of directors of Defendant ISDA. HSBC is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

20. Defendant Barclays Bank PLC ("Barclays") is a United Kingdom public company with its corporate headquarters in London. Barclays, which took over part of the CDS trading operations of Lehman Brothers in late 2008, maintains offices and transacts business in New York City. During the Class Period, Barclays was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Barclays is a part-owner of Defendant Markit, and is represented on the ICE CC Risk Committee as well as on the board of Defendant ISDA. Barclays is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

21. Defendant BNP Paribas S.A. ("BNP Paribas") is a French banking company headquartered in Paris. BNP Paribas trades in the U.S. CDS market, and maintains offices and transacts business in New York, New York. During the Class Period, BNP Paribas was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class. Defendant BNP Paribas is a part-owner of Defendant Markit, and is represented on the board of Defendant ISDA. BNP Paribas is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

22.    Defendant Credit Suisse Group AG ("Credit Suisse") is multinational financial services holding company headquartered in Zurich.  Credit Suisse is an active dealer in the U.S. CDS market and maintains offices and transacts business in New York, New York.  During the Class Period, Credit Suisse was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  Credit Suisse is a part-owner of Defendant Markit, and is represented on the board of Defendant ISDA as well as the ICE CC Risk Committee.  Credit Suisse is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

23.    Defendant The Royal Bank of Scotland Group plc ("RBS") is a United Kingdom company headquartered in Edinburgh.  RBS is an active dealer in the U.S. CDS market and maintains offices and transacts business in New York, New York.  During the Class Period, RBS was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.  RBS is a part-owner of Defendant Markit and is represented on the board of directors of Defendant ISDA.   RBS is one of the 13 banks charged by European regulators with collusively blocking the entry of exchange trading in the CDS market.

24.    Defendant UBS AG is a Swiss global financial services company headquartered in Zurich. Defendant UBS Securities, LLC is headquartered in Stamford, Connecticut.  Defendants UBS AG and UBS Securities, LLC are referred to collectively here as "UBS."  UBS is active in the U.S. CDS market and maintains offices and transacts business in New York, New York. During the Class Period, UBS was a dealer of CDS, buying CDS from members of the Class and selling CDS to members of the Class.   UBS is a part-owner of Defendant Markit and is represented on the board of directors of Defendant ISDA. UBS is one of the 13 banks charged

by European regulators with collusively blocking the entry of exchange trading in the CDS market.

### C.   Non-Dealer Defendant Markit

25.   Defendant Markit, founded in 2001 to provide daily valuation and pricing data to the CDS market, is a privately-held British company with its principal place of business in London.  Markit has a number of offices in the United States including three offices within this District (two in New York City and a third in Rockland County, New York).  The Dealer Defendants control Defendant Markit, and collectively have a majority ownership stake in Markit.  In addition to their ownership stake, the Dealer Defendants control Defendant Markit through seats on its board of directors, which currently includes executives from Defendants BAC, Chase, Goldman Sachs, HSBC and Morgan Stanley.  When the Dealer Defendants took over majority ownership of Defendant Markit, they agreed to supply Markit with exclusive information for their CDS trades, and in 2003 Markit became the first entity in the world to provide daily, end-of-day CDS valuation services.

26.   In September 2009, along with the DTCC, Defendant Markit established a joint venture, co-conspirator MarkitSERV, a "gateway" entity that provides CDS trade processing services.  Markit and MarkitSERV (which has been wholly-owned by Defendant Markit since early 2013) collect and distribute trading information to the Dealer Defendants from the sales of CDS on the OTC market.  Markit is a provider of critical price information; Defendant Markit is not a "clearinghouse" like co-conspirator ICE CC (ICE CC is a financial institution that provides clearing and settlement services for the Dealer Defendants' CDS trades).

### D.   Non-Dealer Defendant ISDA

27.   Defendant ISDA is a key derivatives service association based in New York City which describes itself on its website as "represent[ing] participants in the privately negotiated

derivatives industry, [and] is the largest global financial trade association." All of the Dealer Defendants are members of ISDA. Moreover, as shown in the chart above, executives from Dealer Defendants Citi, Goldman Sachs, HSBC, BNP Paribas, Barclays, Morgan Stanley, Credit Suisse, Deutsche, RBS and BAC hold ten of the 21 seats on Defendant ISDA's board of directors, and one of Defendant ISDA's four top officers is a managing director at Defendant Chase.

28.    One of ISDA's primary functions is the creation of standardized contracts for derivatives trading. Throughout the Class Period, the Dealer Defendants have been heavily involved in Defendant ISDA's contract-standardization activities, including the development and implementation of the ISDA Master Agreement and ISDA's Standard North American Contract ("SNAC") which is issued by ISDA and used for virtually all CDS contracts. Defendant ISDA agreed with the Dealer Defendants to include particular terms and conditions into the Master Agreement and the SNAC, including terms dictating that only dealers – and not dealers' customers such as Plaintiff and members of the Class – can disseminate pricing information about CDS trades, which adversely affects buyers and sellers of CDS by precluding them from easily checking on the prices of CDS being offered in the OTC market.

## IV.    NON-PARTY CO-CONSPIRATORS INTERCONTINENTALEXCHANGE, INC., ICE CC AND MARKITSERV

29.    Co-conspirator IntercontinentalExchange, Inc. is a Delaware corporation with its principal place of business in Atlanta, Georgia.

30.    Co-conspirator ICE CC (formerly known as Ice Trust U.S. LLC ("ICE Trust") until it was reorganized and renamed ICE CC in 2011)[1] is a New York trust company with its principal place of business in New York. ICE CC, an indirect subsidiary of

---

[1] All further references in this Complaint use the term "ICE CC" to refer to either ICE Trust or ICE Clear Credit, depending on the time period being referenced.

IntercontinentalExchange, Inc., is owned by ICE US Holding Co., a Cayman holding company that is in turn owned by IntercontinentalExchange, Inc. and the Dealer Defendants. Intercontinental Exchange, Inc. created ICE CC with several of the Dealer Defendants by paying $39 million for Clearing Corp., a clearinghouse partially-owned by Defendants BAC, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, Chase, Morgan Stanley and UBS.  Under the terms of the purchase agreement, the Dealer Defendants that co-own ICE CC evenly share in ICE CC's revenue with Intercontinental Exchange.

31.   ICE CC operates a CDS central clearinghouse to which the Dealer Defendants have directed virtually all of their CDS trading.  A central clearinghouse is responsible for clearing trades, collecting and maintaining collateral from the participants, overseeing delivery and trade settlement, and reporting transaction data.  A central clearinghouse manages the risk along with the Dealer Defendants, that could arise if the purchaser of a CDS cannot make the required payment when it is due or the CDS seller is unable to perform its contractual obligation (referred to as "counterparty risk").

32.   As a clearinghouse, ICE CC stands between two Dealer Defendants (which are known as "clearing members" or "clearing participants" in their transactions with ICE CC), and the purpose of ICE CC is to reduce the risk of one (or more) of the Dealer Defendants failing to honor its trade settlement obligations (*i.e.*, by failing to make payment in the wake of a "credit event" such as the bankruptcy of the company whose bonds, for example, underlie the CDS).  As further detailed below, the Dealer Defendants' prominent role in setting, in conjunction with co-conspirator ICE CC, the rules and regulations of the ICE CC clearinghouse allowed them to preclude competition in the CDS market by controlling the flow of information necessary for a free and competitive market.

33.   Co-conspirator MarkitSERV is wholly-owned by Defendant Markit and has offices in New York City.  As detailed below, co-conspirator MarkitSERV, which in its role as a "gateway" for CDS trade processing serves as an information portal for vital CDS trading data, has agreed with the Dealer Defendants to restrict the free flow of information into the CDS market.

## V.     OTHER AGENTS AND CO-CONSPIRATORS

34.   The acts alleged against the Defendants in this Complaint were authorized, ordered or performed by their officers, agents, employees or representatives, while actively engaged in the management and operations of Defendants' businesses or affairs.  Each Defendant acted as the principal, agent of or for other Defendants with respect to the acts, violations and common course of conduct alleged by Plaintiff.

35.   Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and made statements which aided and abetted and were in furtherance of the unlawful conduct alleged herein.  Besides IntercontinentalExchange, Inc., ICE CC and MarkitSERV, these co-conspirators include, but are not limited to other banks that are active in the CDS market and which also have an ownership stake in Defendant Markit, namely:  Wells Fargo & Company ("Wells Fargo"), Crédit Agricole S.A. ("Crédit Agricole"), Société Générale S.A. ("Société Générale") and Commerzbank AG ("Commerzbank").  Wells Fargo, Crédit Agricole, Société Générale and Commerzbank were all investigated by European regulators for their role in collusion in the CDS market.

## VI.   FACTUAL BACKGROUND

### A.   Credit Default Swaps And The Operation Of The CDS Market

36.   A credit default swap is a derivative contract designed to transfer the credit risk (the risk of default), and the characteristics and value of the contract are linked to a debt obligation referenced in the contract (the "reference entity," another underlying financial instrument such as a commodity, bond, stock or currency).  CDS are either "single-name" CDS (which is pegged to a specific reference entity) or "index CDS" (which are comprised of a collection, or "basket," of different reference entities).  About half of CDS trades in the United States involve single-name CDS; the other half are made up of index CDS.  Defendant Markit is the primary provider of the indices used for index CDS, which are bought and sold under the names CDX and iTraxx.

37.   CDS are used by investors (typically insurance companies, pension and hedge funds, bond and fixed-income mutual funds and other financial and investment firms) for hedging and investing.   As a hedge, a CDS provides protection against the credit risk arising from holding debt instruments.  As an investment vehicle, CDS can be used to express a view on the future development of the debt issuer's creditworthiness and earn a profit if the view is correct.  CDS were first developed in the 1990s by banks as a way for them to protect themselves against their exposure to large corporate loans they made to their clients.  Since then, CDS have been used to transfer default or credit risk associated with government bonds, mortgage-backed securities, corporate bonds and other forms of debt.

38.   The CDS market is a dealer market – that is, CDS transactions occur "over the counter" rather than on an exchange (such as the NASDAQ or New York Stock Exchange).  On the OTC market, entities wishing to buy or sell CDS cannot do so directly between themselves, but must use an intermediary: the CDS dealer.   Throughout the Class Period, the Dealer

Defendants controlled virtually all of the CDS trades made in the United States OTC market. Because the Dealer Defendants controlled virtually all of these CDS trades, regardless of whether a Class member is a buyer or seller of a CDS, nearly all their CDS transactions in the United States were made through one of the Dealer Defendants.

### B.    Lack Of Regulation In The CDS Market And The Lack Of Market Transparency

39.    On December 21, 2000, President Clinton signed into law the Commodity Futures Modernization Act of 2000 ("CFMA"), which exempted certain qualifying "swap agreements" from the Commodity Exchange Act and defined security-based swap agreements as not constituting "securities." The CFMA thereby ensured that swap agreements, including CDS, were not subject to regulation by the Commodity Futures Trading Commission ("CFTC") or the Securities and Exchange Commission ("SEC"). There has been no active and ongoing agency regulation of the conduct alleged herein.

40.    The Dealer Defendants, in agreement with Defendants ISDA and Markit, have intentionally ensured that the CDS trading market is opaque rather than transparent. Transparent markets allow participants to obtain timely, accurate information indicating the price and size of prospective trading interest (pre-trade transparency) as well as the prices and volumes of completed transactions (post-trade transparency). The widespread availability of timely price information, whether the security is equity or debt, promotes fair and efficient pricing. Examples of transparent markets include the major exchanges for stock trading such as the NYSE or the NASDAQ. Through the electronic reporting of trading volume and price during the trading hours on exchange listed stocks, market participants have almost instantaneous access to share price and volume traded. The transparency of such markets also results in full disclosure of spreads for the buying and selling of stocks. This transparency results in narrower spreads

between the "bid" and "ask" price on stocks compared to less transparent financial trading markets – such as the CDS market dominated by the Dealer Defendants.

41.   There are real-world examples showing the pro-competitive effects of price transparency in trading markets.  Examination of the private corporate bond, municipal bond and NASDAQ equity markets, and regulatory efforts to increase the transparency of those markets, shows that increased price transparency and information results in lower transaction costs.

42.   For example, in the corporate bond market prior to 2002, quotations for the purchase of such bonds were available only to market professionals and prices at which bond transactions were completed were not publicly available information.  In July 2002, regulators of the United States corporate bond market introduced the Transaction Reporting and Compliance Engine ("TRACE") system which required corporate bond dealers to report all trades in publicly issued TRACE eligible securities making such information available to bond investors.  Several years after the introduction of the TRACE system, academic research found that transaction costs were lower for bonds with transparent trade prices, and that prices dropped when the TRACE system started to publicly disseminate their prices – clearly indicating that the trading public benefited from the price transparency that TRACE injected into the bond market.

43.   Similar studies of the municipal bond market and the introduction of greater transparency in that market in recent years clearly show that greater price transparency in the municipal bond market results in lower transaction costs.  One such study found that the average trading costs in municipal bonds, when they traded on an exchange, were one-half of what they were in the OTC market, and attributed this differential to differences in market structure and greater price transparency.  Finally, studies of the NASDAQ equity trading market after market

reforms were introduced in 1997 that increased reporting of bid-ask spreads also concluded that increased transparency resulted in reduced spreads on NASDAQ trades.[2]

44.    The CDS market is decidedly different than transparent markets where participants trade on central exchanges like the NYSE or NASDAQ; rather, it is entirely opaque.  In the CDS market, there is no central exchange where the prices of CDS are listed and widely available to investors on both a pre-trade and post-trade basis.  Instead, when an entity wants to buy a CDS, it must place an order with one of the Dealer Defendants, which then matches that order with someone selling the same type of CDS.  As a result of this opaque market, a Dealer Defendant tells the buyer of a CDS only what that Dealer Defendant will pay for the contract, and tells the seller of the same contract only the amount it will receive.  Only the Dealer Defendant knows the prices for both sides of the transaction – and only the Dealer Defendant has something close to true price transparency for CDS trades.

45.    The lack of transparency allows the Dealer Defendants to keep CDS spreads artificially inflated, and enables the Dealer Defendants to extract substantial profits from their CDS trades.  The derivatives-related revenues generated by Defendants are estimated to be in the range of $30 billion annually.  Based on quarterly reports of CDS and other derivatives trading compiled by the Office of the Comptroller of the Currency ("OCC"), Plaintiff believe that at least $4 billion of that $30 billion worth of derivatives-trading revenue is generated by the Dealer Defendants' CDS trading.  As a result, the Dealer Defendants have every incentive to prevent the

---

[2] The same result was observed as early as 1973 in the equity option market.  In 1973, the Chicago Board Options Exchange became the first organized and regulated market place for trading of standardized, listed options on equity securities.  What was found, following the 1973 reforms, was that moving such trading to an options exchange significantly enhanced the price transparency of options trading resulting in not only greater liquidity for such options but also lower transaction costs for participants in those markets.

CDS market from becoming less opaque, as greater transparency would lead to greater competition, reduce spreads, and diminish the Dealer Defendants' CDS trading profits.

46.    Unlike futures exchanges or the stock markets, which provide continuous information as to transaction prices and volumes, for CDS trading there is only one source of after-the-fact pricing information: Defendant Markit.  And even Defendant Markit's data does not accurately reflect actual transactions:  the limited CDS price and volume data provided to market participants is published at the end of each trading day by Defendant Markit.  Although Markit collects and compiles the aggregate CDS transaction data that the Dealer Defendants report to it at the end of each day, Markit does not report the actual trade data in real-time.  Instead, Markit reports the **average** price for these transactions.  Thus, neither Defendant Markit (nor any other service) provides actual transaction prices in CDS trading in real time as is true in the stock, options and futures markets.

47.    With no objective central price (like those provided by a stock exchange), the Dealer Defendants' CDS trading desks are not required to mark their books to reflect actual transaction prices.  Instead, the Dealer Defendants mark their books according to what they deem their positions to be worth, further contributing to the lack of true, verifiable price information in the CDS market.

48.    While in theory, buyers and sellers of CDS could shop around to several Dealer Defendants, in practice, the Dealer Defendants will not provide those buyers or sellers with a firm quote, but instead will just give an "indicative" or conditional price.  By proffering only conditional prices, Dealer Defendants are free to change the price of the transaction until the moment the trade was closed.

49.   Buyers and sellers are dependent on the Dealer Defendants as to the price at which they buy or sell a CDS.  Purchasers or sellers of CDS have no way of knowing whether the price is the best one, since there is no pre-trade transparency and limited post-trade transparency. Purchasers and sellers have no way of knowing at what price counterparties are willing to buy or to sell, nor do they have comparable real-time price data against which to compare the price of their particular trade.  Buyers and sellers do not know the equivalent of the bid and ask prices for the CDS they purchase but must rely instead on the price at which the Dealer Defendants claim to be able to purchase or sell a particular CDS.  Such an opaque market is ideal for the Dealer Defendants:  The less the customer knows, the wider the spread the Dealer Defendants can charge.

C.   **The Dealer Defendants' Control Over The CDS Market**

50.   According to the OCC report for the quarter ended March 31, 2013, the CDS trading market in the United States is dominated by the Dealer Defendants: out of $13.510 trillion in total notional CDS purchases or sales in the first quarter of 2013 by all CDS dealers, well over 99 percent of those trades were made by the Dealer Defendants.  According to OCC reports available on the regulator's website, from the first quarter of 2008 through the first quarter of 2013, the market share of the Dealer Defendants steadily increased, going from roughly 90 percent in early 2008 to well over 99 percent by mid-2013.

51.   As alleged more fully below, the Dealer Defendants exert control over trading in the CDS market by, among other things, controlling the market infrastructure of CDS trading including the institutions that report trading data and those that clear and settle trades.   In particular, the establishment of ICE CC and the Dealer Defendants' control of that institution have increased their ability to dominate the CDS trading market.  Through such control, the

Dealer Defendants are able to set and maintain artificially inflated spreads for buyers and sellers of CDS.

## VII.   DEFENDANTS' WRONGFUL CONDUCT

### A.   The Dealer Defendants Conspired To Inflate CDS Spreads

#### 1.   Overview of Wrongdoing Alleged

52.   Starting on or before January 1, 2008 and continuing through such time as the effects of Defendants' illegal conduct and conspiracy ceased, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, contract, combination or conspiracy in restraint of trade for the purpose of artificially increasing and maintaining the spreads for CDS traded on the OTC market within the United States, including the following activities:

- The Dealer Defendants communicated among themselves concerning transaction costs, bid-ask spreads and otherwise shared information about the prices at which CDS customers paid for, or sold, such contracts;

- The Dealer Defendants agreed through meetings and conversations among themselves to fix, raise, maintain or stabilize prices, including the spreads for CDS;

- The Dealer Defendants, along with Defendants Markit and ISDA, effectively locked out other providers of information about the market for and trading of CDS, reducing the transparency that otherwise would have allowed prices for CDS to be set on a competitive basis;

- After establishing co-conspirator ICE CC, the Dealer Defendants used their control of ICE CC to create membership rules and other practices that prevented other CDS dealers from transacting business on ICE CC (the largest, and only truly viable, CDS clearinghouse) thereby reducing competition in the CDS trading market; and

- The Dealer Defendants conspired with Defendants ISDA and Markit to block potential competitors from establishing a central exchange for trading CDS, which would have injected transparency and price competition into the CDS market.

2.    **The Dealer Defendants Control**
      **Trading and Information in the CDS Market**

a.    **The Dealer Defendants Control The Dissemination Of**
      **CDS Trading Information Through Defendant Markit**

53.    The Dealer Defendants control the distribution of CDS price and trading information through their domination of Defendant Markit, the primary source of published CDS trading data.

54.    The Dealer Defendants agreed with Defendant Markit to supply it with exclusive information for their CDS trades, and in turn Defendant Markit agreed with the Dealer Defendants to:  (a) limit the dissemination of that CDS trading information; (b) report only daily average (not actual real time) prices for CDS transactions; and (c) afford the Dealer Defendants unfair access to Defendant Markit's pricing information.  The agreement enabled Defendant Markit to become the only source of published CDS trading data.  As a result of this agreement with Defendant Markit, the Dealer Defendants were able to control the dissemination of that data, including critical information that would, in a transparent, competitive market, allow buyers and sellers of CDS to obtain accurate information regarding the spreads on CDS trades.

55.    Defendant Markit is not a CDS clearinghouse, but the information it collects and disseminates is critical to the functioning of such entities because clearing and settlement (the primary functions of a clearinghouse) can only be accomplished using the kind of pricing data that is Markit's bread and butter.  Yet Defendant Markit only allowed the companies seeking to establish CDS clearinghouses – Eurex and CME – access to its data if every CDS transaction that the clearinghouses guaranteed included one of what Markit dubs its bank "partners" – that is, the Dealer Defendants that own Markit and have sole access to its real-time pricing information.

56.    By forcing the emerging clearinghouses to clear only CDS transactions in which the Dealer Defendants were participants, the Dealer Defendants and Defendant Markit stifled

competition from other dealers, including State Street Corporation and the Bank of New York Mellon, that could have provided better prices, and also precluded Plaintiff and other members of the Class from buying and selling directly with each other without the Dealer Defendants acting as intermediaries. The conditions imposed by Defendant Markit delayed the creation of CDS clearinghouses, including, but not limited to, those operated by MFGI, CME and Eurex, and continued to ensure the Dealer Defendants' ability to artificially inflate and maintain spreads for end-users of CDS. As of February 2012, ICE CC had cleared $16.264 trillion of notional value of CDS, while CME had cleared only $189.5 million of notional value.

### b.  The Role Of The DTCC And Co-Conspirator MarkitSERV

57.   Once a Dealer Defendant consummates a CDS trade, the terms, payments and parties to that transaction must be formally processed and confirmed. These tasks are accomplished by the DTCC which, through its subsidiaries Warehouse Trust Company, LLC and DTCC Derv/SERV, LLC, handles all aspects of settling the Dealer Defendants' CDS trades.

58.   A plurality of DTCC's 19-member board of directors is comprised of Dealer Defendants' executives, namely: Lori Hricik and Paul H. Compton of Defendant Chase; Suni Harford of Defendant Citi; Stephen C. Daffron of Defendant Morgan Stanley; Robin A. Vince of Defendant Goldman Sachs; Jonathan W. Hitchon of Defendant Deutsche Bank; Darryll Hendricks of Defendant UBS; and Mark D. Linsz of Defendant BAC. In addition, Robert Druskin, DTCC's Executive Chairman, was a top executive with Defendant Citi for sixteen years and one other DTCC director is the Chairman of MarkitSERV. DTCC's board meetings provided the Dealer Defendants opportunity to meet and exchange competitive-sensitive information.

59.    Those two subsidiaries make the DTCC the central repository for CDS settlement data, and as such, the DTCC is able to derive transaction prices from the data it has and receives. The DTCC could disseminate this information widely on a real-time basis to data vendors or other services providers, and the timely widespread publication of actual CDS trading data by the DTCC would both undermine Defendant Markit's virtual monopoly on pricing information and provide the transparency that would result in reduced spreads (and in turn substantially reduce the Dealer Defendants' profits on these transactions). However, the DTCC does not disseminate real-time CDS trade data to all market participants, and the only post-trade CDS information available to the broader market from the DTCC is weekly, aggregated data. The DTCC only provides such real-time post-trade data to the DTCC's members (which includes all of the Dealer Defendants) and, importantly, to Defendant Markit and co-conspirator MarkitSERV.

60.    Co-conspirator MarkitSERV is the exclusive portal for the reporting of CDS OTC trading. MarkitSERV provides trade confirmation, position reconciliation, and transaction processing for CDS trades worldwide. MarkitSERV is governed by an eleven-member board of directors, which upon information and belief includes as many as seven directors representing the Dealer Defendants (four additional directors, two from Defendant Markit and two from DTCC, comprise the remainder of the board). The MarkitSERV portal, which is controlled by Defendant Markit, helps the Dealer Defendants maintain their control over dissemination of crucial CDS trading information.

### c.    The Role Of Defendant ISDA

61.    In addition to Defendant Markit (and its MarkitSERV portal, operated by co-conspirator MarkitSERV), the Dealer Defendants' conspiracy has been aided by Defendant ISDA, which like Defendant Markit, has conspired with the Dealer Defendants and given those Defendants the ability to collusively restrict the availability of pricing information.

62.    The Dealer Defendants require buyers and sellers of CDS to enter into an ISDA Master Agreement prior to trading CDS.  The form of the standardized ISDA Master Agreement, as well as the standardized SNAC agreement that is used in virtually all CDS trades, was jointly established by the Dealer Defendants through their participation in ISDA.  The ISDA Master Agreement includes a clause that gives the dealer – and not its customer – the sole right to disseminate information about the terms of a CDS transaction.  There is no reason for only one party to a two-party CDS trade (where both parties, the dealer and the customer, supply information to each other) to have sole control over this critical trading data.  ISDA has agreed with the Dealer Defendants to adopt these clauses in all CDS trades, cementing the Dealer Defendants' control over CDS trading data.

63.    Defendant ISDA has also conspired with the Dealer Defendants in their efforts to block potential competitors from the CDS market.  When the CME began setting up a CDS exchange in 2009, Defendant ISDA, at the insistence of the Dealer Defendants, limited the CME's ability to secure the necessary licenses to ISDA's intellectual property (the ISDA Master Agreement).  Instead of allowing the CME to obtain a license to use the ISDA Master Agreement for an exchange platform – a platform that would have allowed for CDS trades to be conducted with the kind of transparency crucial to an open, competitive trading market – ISDA agreed with the Dealer Defendants and only allowed the CME to obtain licenses to use the ISDA Master Agreement on a clearing platform.

64.    ISDA's refusal to grant CME a license to use the ISDA Master Agreement for an exchange was contrary to ISDA's self-interest, because an exchange platform would have boosted the number of market participants and increased ISDA's licensing revenue due to the increased number of participants using the ISDA Master Agreement.

65.    Faced with ISDA's refusal to grant it a license to use the ISDA Master Agreement for exchange-trading of CDS, the CME abandoned its plans to open up a CDS exchange, and decided to use a clearinghouse platform instead. As described below, the CME's clearinghouse platform was not a viable competitor to ICE CC, the clearinghouse created by (and for the exclusive benefit of) the Dealer Defendants.

### d.    The Dealer Defendants Dominate Co-Conspirator ICE CC, The Primary CDS Clearinghouse

66.    The Dealer Defendants recognized that their dominance of CDS trading was threatened in late 2008 by rising calls from regulators and members of Congress for regulation of the CDS trading market. In response, they attempted to blunt the impact of any reform by creating a central clearinghouse for CDS trades. The central clearinghouse that the Dealer Defendants created was co-conspirator ICE CC.

67.    The Dealer Defendants are co-owners of ICE CC along with co-conspirator IntercontinentalExchange, Inc., but their dominance of ICE CC goes beyond mere ownership. The Dealer Defendants also make up two-thirds of the 12-member ICE CC Risk Committee, and Plaintiff are informed and believe that current members of the ICE CC Risk Committee include the following nine representatives from the Dealer Defendants: Thomas J. Benison of Defendant Chase, Oliver Frankel of Defendant Goldman Sachs, Ali Balali of Defendant BAC, Biswarup Chatterjee of Defendant Citi, James J. Hill of Defendant Morgan Stanley, Athanassios Diplas of

Defendant Deutsche Bank, Paul Hamill of Defendant UBS, Paul Mitrokostas of Defendant Barclays, and Andy Hubbard of Defendant Credit Suisse.

68.   The Risk Committee meets monthly in New York City where it sets the terms of CDS trading on ICE CC including which financial institutions may participate as dealers in ICE CC cleared trades.   At the monthly meetings of the Risk Committee, the Dealer Defendants' representatives make agreements and establish rules for participants in ICE CC for the express purpose of maintaining their control over the CDS trading market.   Among other things, the Dealer Defendants have agreed to establish unreasonably high net capital requirements upon any bank that wishes to participate in ICE CC.

69.   The Dealer Defendants have agreed to use their control over ICE CC, in particular their control over the ICE CC Risk Committee, to exclude competition from other firms that seek to clear CDS trades through ICE CC, undermine competing clearinghouses that would allow clearing of CDS transactions without the involvement of the Dealer Defendants, and keep the spreads paid by end-users artificially inflated.

70.   First, through their control over ICE CC, the Dealer Defendants have established substantial barriers to entry by requiring any dealer that clears CDS trades through ICE CC to have an enormous net worth.   During virtually all of the Class Period, under rules set by the Risk Committee, a financial institution was not allowed to participate in ICE CC as a designated clearing member unless it had a net worth of at least $5 billion; the threshold was reduced to $100 million in mid-2011 in anticipation of regulatory action by the CFTC mandating changes to ICE CC's membership requirements.   This threshold has, for nearly the entire Class Period, effectively locked out competition from other end-users and other firms, such as Bank of New

York Mellon and State Street Corporation from clearing trades on ICE CC. The ICE CC capital requirements have been greater than those for other clearinghouses in other markets.

71.   Other rules and practices of ICE CC effectively lock out competition. First, ICE CC does not permit real-time transactions by firms that are not designated clearing members. The lag time between when a CDS trade is submitted and when it is accepted for clearing increases the risk that the trade could be rejected. Because end-users could avoid this risk by conducting CDS trades through one of the Dealer Defendants, this rule dissuades end-users from trading with smaller firms.

72.   Second, ICE CC does not protect the anonymity of end-users that execute CDS trades through non-member firms. As end-users tend not to want their trading and hedging strategies exposed, this practice deters them from conducting CDS trades with smaller firms that cannot meet the ICE CC's designated clearing membership requirements.

73.   Third, ICE CC imposes relatively high fees and allows low levels of leverage as compared to the prevailing terms in the bilateral market. Such fees and leverage caps do not deter the Dealer Defendants from clearing trades on ICE CC, because they share in the revenue generated by ICE CC and are willing to accept each other's credit. Nonetheless, these terms discourage end-users and smaller dealers from clearing CDS trades through ICE CC.

74.   As a result of these exclusionary rules, nearly all of the CDS trades cleared through ICE CC are between the Dealer Defendants, to the exclusion of any other potential market participants. Although the Dealer Defendants claim to compete in the CDS trading market against each other, the rules set by Dealer Defendants acting through the ICE CC Risk Committee have limited and excluded competition in the CDS trading market. Because any single Dealer Defendant is unlikely to have sufficient inventory to meet all of its clients'

demands for particular CDS products, the Dealer Defendants trade with each other to satisfy their clients' needs, and clear those trades through ICE CC. End-users of CDS, however, have limited ability to access ICE CC on their own and are primarily relegated to buying and selling with one of the Dealer Defendants bilaterally in an opaque market.

75.    Although ICE CC purports to provide greater transparency to the CDS trading market, in reality it maintains the Dealer Defendants' dominance of this market, allowing them to artificially inflate the spreads for CDS.

**B.    Government Investigations**

76.    Authorities in the United States and Europe are investigating anticompetitive practices with respect to CDS trading by the Dealer Defendants.

**1.    Department of Justice Investigation of
Anticompetitive Conduct in the CDS Market**

77.    On July 15, 2009, DOJ spokesperson Laura Sweeney confirmed that, "[t]he Antitrust Division is investigating possible anti-competitive practices in the credit derivatives clearing, trading and information services industries." On or about March 20, 2012, a DOJ spokeswoman confirmed that the DOJ's antitrust investigation of the CDS trading market was ongoing.

78.    Specifically, the DOJ is investigating: (a) whether the Dealer Defendants' part ownership of Markit gives them privileged access to credit default spreads and trading patterns; (b) whether Markit permits the use of its indices by another clearinghouse only if every swap guaranteed by the clearinghouse includes an ICE CC member bank; and (c) whether Defendant Markit requires that its services be bundled. The DOJ is also investigating Defendant Markit for potential anticompetitive practices ranging from requiring customers to buy bundled services, to restricting which trades can be cleared in the CDS market.

79.   Defendant Markit has acknowledged that its "privileged relationships with 16 shareholder banks" – 12 of which are named here as Dealer Defendants – gives it "unparalleled access to a valuable dataset spanning credit, equities, and the broader OTC derivative universe."

80.   The DOJ's concerns over the lack of transparency in trading and pricing information in the derivatives markets are not new.  In fact, in its December 28, 2010 comment letter to the CFTC, the DOJ discussed the numerous anticompetitive effects of allowing a small number of Dealer Defendants to control execution and clearing platforms.   In addition to warning of the potential that the dealers "might use such a platform to exclude rival dealers or other market participants that would otherwise compete for trading volume," the DOJ warned the CFTC that "[a] dealer-controlled trading platform also might release less innovative data products or be less transparent than would an independent platform."

### 2.   The EC's Investigation of Anticompetitive Conduct in the CDS Market

81.   On April 29, 2011, the EC announced that it had opened two antitrust investigations concerning the CDS market.  According to the EC's press release, "[i]n the first case, the EC will examine whether 16 investment banks and Markit, the leading provider of financial information in the CDS market, have colluded and/or may hold and abuse a dominant position in order to control the financial information on CDS."  The EC stated that it "has indications that the 16 banks that act as dealers in the CDS market give most of the pricing, indices and other essential data only to Markit, the leading financial information company in the market concerned.  This could be the consequence of collusion between them or an abuse of a possible collective dominance and may have the effect of foreclosing the access to the valuable raw data by other information providers."

82.    The banks identified by the EC that are targets of the first investigation include all of the Dealer Defendants, along with Wells Fargo/Wachovia and European banks Société Générale, Crédit Agricole and Commerzbank. Defendant Markit was also implicated, with the EC further stating that: "[t]he probe will also examine the behavior of Markit, a UK-based company created originally to enhance transparency in the CDS market. The EC is now concerned certain clauses in Markit's license and distribution agreements could be abusive and impede the development of competition in the market for the provision of CDS information."

83.    The EC is also investigating whether certain banks received preferential treatment from ICE CC that "have the effect of locking them in the ICE system to the detriment of competitors." The EC's press release stated that the investigation concerned a number of agreements between the CDS dealers at the time they formed ICE CC through the sale of Clearing Corp. to co-conspirator IntercontinentalExchange, Inc. The agreements "contain a number of clauses (preferential fees and profit sharing arrangements) which might create an incentive for the banks to use only ICE as a clearing house. The effect of these agreements could be that other clearing houses have difficulties successfully entering the market and that other CDS players have no real choice where to clear their transactions."

84.    The EC identified Dealer Defendants BAC, Barclays, Chase, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, and UBS as the targets of their second investigation. The EC further stated that it "will also investigate whether the fee structures used by ICE give an unfair advantage to the nine banks, by discriminating against other CDS dealers. This could potentially constitute an abuse of a dominant position by ICE...."

85.    In a statement referring to the EC's investigations, European Union antitrust commissioner Joaquin Almunia said, "[l]ack of transparency in markets can lead to abusive

behavior and facilitate violations of competition rules. . . . I hope our investigation will contribute to better functioning of financial markets and, therefore, to more sustainable recovery."

86.   On March 26, 2013, the EC announced that it was likely to file an action against the targets of their dual investigations for collusion in the CDS trading market.   The EC also announced on that date that Defendant Markit and ICE Clear Europe (the European clearinghouse also owned by co-conspirator ICE CC) were also part of the EC's investigation. Defendant ISDA was also identified as a possible target of the probe into anti-competitive behavior in CDS trading.

87.   On July 1, 2013, the EC charged all of the Dealer Defendants, as well as Defendants ISDA and Markit, with engaging in anticompetitive behavior.   Specifically, the EC alleged that the Dealer Defendants blocked two exchanges (Eurex and CME) from establishing CDS exchanges by denying them the necessary licenses to operate the trading platforms. Instead, as detailed above, the Dealer Defendants, which dominate and/or control Defendants ISDA and Market, told these two entities to only license Eurex and CME (potential competitors of co-conspirator ICE CC) for over-the-counter derivative trading, which resulted in higher spreads for their customers.   According to the EC, the Dealer Defendants used other tactics to shut out competition from exchanges, including coordinating their choices of preferred clearinghouses for CDS transactions.

## VIII.   CLASS ALLEGATIONS

88.   Plaintiff brings this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil procedure, on behalf of itself and all others similarly situated.   The proposed Class is initially defined as:

All persons or entities who, between January 1, 2008 and such
time as the effects of Defendants' illegal conduct ceases, purchased
or sold CDS directly from or to the Dealer Defendants, in the
United States and its territories, or for delivery in the United States
or its territories. Excluded from the Class are Defendants and their
employees, affiliates, parents, subsidiaries and co-conspirators.

89.   The Class is so numerous that joinder of all members is impracticable. While the
exact number of the Class members is unknown to Plaintiff at this time and can only be
discerned through discovery, Plaintiff is informed and believes that at least thousands of Class
members traded CDS during the Class Period.

90.   Plaintiff's claims are typical of the claims of the other members of the Class.
Plaintiff and other Class members sustained damages arising out of Defendants' common course
of conduct in violation of law as complained herein. The injuries and damages of each member
of the Class were directly caused by Defendants' wrongful conduct in violation of law as alleged
herein.

91.   Plaintiff will fairly and adequately protect the interests of the members of the Class
and has retained counsel competent and experienced in class action litigation, including antitrust
class action litigation.

92.   Common questions of law and fact exist as to all members of the Class which
predominate over any questions affecting solely individual members of the Class, including:

- Whether the Dealer Defendants engaged in a contract, combination, and/or
  conspiracy to fix, raise, maintain, or stabilize prices of CDS including bid-
  ask spreads;

- Whether the Dealer Defendants' conduct caused the spreads in CDS to be
  greater than they otherwise would be in a competitive market;

- Whether Plaintiff and other Class members were injured by Defendants'
  conduct, and, if so, the appropriate class-wide measure of damages for
  Class members; and

- Whether Plaintiff and other Class members are entitled to injunctive relief and, if so, the nature and extent of such injunctive relief. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

93. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

94. The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. Plaintiff does not anticipate any difficulty in the management of this action as a class action.

## IX.   TRADE AND COMMERCE

95. During the Class Period, the Dealer Defendants purchased and sold CDS on the OTC market in a continuous and uninterrupted flow of interstate and foreign commerce, including through and into the Southern District of New York. The Dealer Defendants' business activities substantially affected interstate trade and commerce in the United States, and caused antitrust injury in the United States. All Defendants facilitated the alleged conspiracy through the instrumentalities of interstate commerce.

96.   During the Class Period, the Dealer Defendants collectively controlled between 90 percent (at the beginning of the Class Period) to well over 99 percent (at the current time) of the market for trading of CDS in the United States.

## X.   FRAUDULENT CONCEALMENT

97.   Defendants' unlawful conduct as alleged above was self-concealing.   The Dealer Defendants, along with Defendants ISDA and Markit, conspired and engaged in secret activities for the purpose of fixing, raising, maintaining, or stabilizing spreads for CDS.   The Dealer Defendants fraudulently concealed their participation in the conspiracy by, among other things, engaging in communications and periodic meetings with representatives of other Dealer Defendants in furtherance of the conspiracy, including at meetings of Defendants Markit and ISDA, co-conspirator ICE CC, and the DTCC.   Moreover, as detailed above, the nature of the CDS market is opaque and lacks the transparency that would have aided Plaintiff and other members of the Class in discovering the illegal conduct alleged herein.

### COUNT I

### Against All Defendants For Violation Of Section 1 Of The Sherman Act

98.   Plaintiff incorporates by reference and realleges the allegations set forth above as though fully set forth herein.

99.   During the Class Period, Defendants entered into and engaged in a contract, combination or conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices associated with the purchase and/or sale of CDS in the United States in violation of in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.   Such contract, combination or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

100. The contract, combination or conspiracy consisted of an agreement, understanding, or concerted action among the Dealer Defendants, the substantial terms of which included agreements:

    a.  To preclude potential competitors from creating a competitive CDS exchange in the United States, and to establish, with the aid of Defendants ISDA and Markit, and co-conspirator ICE CC, rules and regulations that would assist in precluding such competition; and

    b.  To establish ICE CC as a means to preclude the creation of a competitive CDS exchange in the United States.

101. For the purpose of forming and carrying out the alleged contract, combination or conspiracy, and in furtherance of the conspiracy, the Dealer Defendants, among other things: (a) participated in meetings, conversations, and communication to create the aforementioned anticompetitive rules and practices of Defendants ISDA and Markit and co-conspirator ICE CC; and (b) agreed, during those meetings, conversations and communications, to take actions intended to fix the prices associated with the purchase and sale of CDS in the United States.

102. Defendants ISDA and Markit, and co-conspirator ICE CC are dominated or controlled by, or have vital financial relationships, with numerous Dealer Defendants. The Dealer Defendants' dominance and/or control of Defendants ISDA and Markit have allowed Defendants ISDA and Markit to successfully join in the Dealer Defendants' overarching scheme to create an opaque CDS trading system, a system which was purposefully designed to block new entrants from the market, which would bring the prices of the Dealer Defendants' spreads to a truly competitive level. Co-conspirators ICE CC and MarkitSERV were also integral parts of ensuring the success of the Dealer Defendants' illegal conduct.

103. The ISDA and Markit rules and regulations, promulgated by the Dealer Defendants as a requirement to gain access to relevant CDS trading information, have no legitimate business purpose, and were designed to ensure the Dealer Defendants' continued dominance of the CDS market in the United States.

104. As a direct and proximate result of Defendants' illegal conduct, Plaintiff and the other Class members have suffered injury to their business or property. Plaintiff's injuries consist of inflated transaction costs associated with the purchase and sale of CDS in the United States caused by Defendants' misconduct. Plaintiff's injuries are of the type the antitrust laws were designed to prevent, and flow from Defendants unlawful conduct.

105. Plaintiff and the other Class members are entitled to treble damages for all Defendants' violations of Section 1 of the Sherman Act as alleged here.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands that judgment be rendered in favor of Plaintiff against Defendants as follows:

1.     Certifying this action as a class action pursuant to Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as a representative of the Class and Plaintiff's counsel as counsel for the Class;

2.     Decreeing that all Defendants engaged in a contract, combination and conspiracy in violation of Section 1 of the Sherman Act and that Plaintiff and the other Class members were injured in their business and property as a result of Defendants' violations;

3.     Permanently enjoining Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf from continuing and maintaining the combination, conspiracy or agreement alleged herein, specifically including the promulgation and enforcement of the anticompetitive rules and regulations of Defendants ISDA and Markit, and co-conspirator ICE CC described above, which have acted to foreclose competition the CDS market in the United States, including those rules and regulations that serve to  prevent all qualified market participants from dealing in the CDS market; and foreclose new entrants in the electronic trading of CDS.

4.     Awarding Plaintiff and the other Class members damages against Defendants for their violations of the federal antitrust laws in an amount to be trebled in accordance with such laws;

5.     Finding Defendants jointly and severally liable for the damages incurred by Plaintiff and the other Class members;

6.     Awarding to Plaintiff and the other Class members pre-judgment and post-judgment interest at the highest legal rate from and after the date of service of the initial complaint in this action;

7.     Awarding to Plaintiff and the other Class members their costs of suit, including reasonable attorneys' fees and expert fees; and

8.     Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

Dated:  November 8, 2013

**ENTWISTLE & CAPPUCCI LLP**

Andrew J. Entwistle, Esq.
Vincent R. Cappucci, Esq.
Robert N. Cappucci, Esq.
280 Park Avenue, 26th Floor West
New York, NY 10017
Telephone:  (212) 894-7200

Robert N. Kaplan, Esq.
Gregory K. Arenson, Esq.
Richard J. Kilsheimer, Esq.
Matthew P. McCahill, Esq.
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Ariana J. Tadler, Esq.
Peggy J. Wedgworth, Esq.
Paul F. Novak, Esq.
**MILBERG LLP**
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 946-9453

Reed R. Kathrein, Esq.
Steve Berman, Esq.
Jason A. Zweig, Esq.
**HAGEN BERMAN SOBOL SHAPIRO LLP**
715 Hearst Ave, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000

*Attorneys for Plaintiff Fund Liquidation Holdings LLC*
