**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------- x
                                                 :
                                                 :
IN RE CREDIT DEFAULT SWAPS ANTITRUST      :
LITIGATION                                        :       13 Md. 2476 (DLC)
                                                 :
This Document Relates To: All Actions           :
                                                 :
                                                 :
                                                 :
-------------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF CLASS COUNSEL'S MOTION**
**FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,**
**AND INCENTIVE AWARDS FOR CLASS REPRESENTATIVES**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................1

THE WORK UNDERTAKEN BY CLASS COUNSEL..................................................5

    A.    Pre-Appointment Case Investigation and Initial Complaints ..................5

    B.    Pleadings and Motions to Dismiss ..........................................................6

    C.    Discovery Efforts ...................................................................................7

    D.    Expert Work and Class Certification Preparation..................................11

        1.    Impact and Damages Analysis by BRG......................................12

        2.    Professor Darrell Duffie ..........................................................15

        3.    Other Experts ..........................................................................15

    E.    Mediation Strategy and Settlement ......................................................16

ARGUMENT ....................................................................................................16

I.    CLASS COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE ........................16

    A.    The Request is Consistent with the Fee Scale Negotiated by LACERA..............16

    B.    Class Counsel's Request is Well Within the Range Used Under the Second Circuit's Preferred Percentage-Based Methodology................................19

    C.    The Requested Fees Are Appropriate Under the *Goldberger* Factors..................21

        1.    The Risk of the Litigation ........................................................21

        2.    Complexity of the Case............................................................24

        3.    Quality of Representation and Time Spent by Counsel .............25

        4.    The Fee is Reasonable in Relation to the Settlement................27

        5.    Public Policy Considerations ...................................................30

    D.    The Lodestar Cross-Check Supports The Requested Fee......................31

    E.    The Reaction of the Class Supports the Fee ........................................33

i

II.     CLASS COUNSEL'S EXPENSES ARE REASONABLE ................................................34

III.    INCENTIVE AWARDS ARE APPROPRIATE .................................................................36

CONCLUSION...........................................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
No. 03 MD 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ............................20

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) .......................................................................20

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06 MD 1775, 2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015) ................................37, 39, 40

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06 MD 1775 (JG), 2011 WL 2909162 (E.D.N.Y. July 15, 2011) .............................19, 20

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06 MD 1775 (JG), 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ...................................20

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.*,
792 F. Supp. 2d 1028 (N.D. Ill. 2011) ...................................................................................20

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ..................................................................................20

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*,
481 F.2d 1045 (2d Cir. 1973).................................................................................................19

*In re Am. Bank Note Holographies, Inc. Sec. Litig.*,
127 F. Supp. 2d 418 (S.D.N.Y. 2001).....................................................................................32

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of
Elections*,
522 F.3d 182 (2d Cir. 2007)...............................................................................................4, 16

*Asare  v. Change Grp. of N.Y., Inc.*,
No. 12 Civ. 3371 (CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) ................................32

*In re (Bank of Am.) Checking Account Overdraft Litig.*,
830 F. Supp. 2d 1330 (S.D. Fla. 2011) ..................................................................................20

*Bano v. Union Carbide Corp.*,
273 F.3d 120 (2d Cir. 2001)...................................................................................................30

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ..............................................................................30, 32, 33

*In re Cardinal Health Inc. Sec. Litigations*,
528 F. Supp. 2d 752 (S.D. Ohio 2007) ..................................................................................18

*In re Cendant Corp. Litig.*,
   264 F.3d 201 (3d Cir. 2001)....................................................................................17

*City of Providence v. Aeropostale, Inc.*,
   No. 11 Civ. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)...................................32

*In re Colgate-Palmolive Co. ERISA Litig.*,
   36 F. Supp. 3d 344 (S.D.N.Y. 2014)....................................................................................31

*In re Comverse Tech., Inc. Sec. Litig.*,
   No. 06 Civ. 1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010) ............................18

*In re Currency Conversion Fee Antitrust Litig.*,
   263 F.R.D. 110 (S.D.N.Y. 2009) ........................................................................................23

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974)................................................................................................32

*Donoghue v. Morgan Stanley High Yield Fund*,
   No. 10 Civ. 3131 (DLC), 2012 WL 6097654 (S.D.N.Y. Dec. 7, 2012) ..............................20

*In re Excess Value Ins. Coverage Litig.*,
   598 F. Supp. 2d 380 (S.D.N.Y. 2005)................................................................................26

*In re Global Crossing Securities & ERISA Litig.*,
   225 F.R.D. 436 (S.D.N.Y. 2004) ........................................................................................34

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000)........................................................................................ *passim*

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
   142 F.R.D. 588 (S.D.N.Y. 1992) ........................................................................................21

*In re High-Crush Partners L.P. Sec. Litig.*,
   No. 12 Civ. 8557 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 18, 2014)...............................33

*In re Holocaust Victim Assets Litig.*,
   No. 06 CV 0983 (FB), 2007 WL 805768 (E.D.N.Y. Mar. 15, 2007)...................................24

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)................................................................................20

*Jermyn v. Best Buy Stores, L.P.*,
   No. 08 Civ. 214 (CM), 2012 WL 2505644 (S.D.N.Y. June 27, 2012)................................23

*In re Linerboard Antitrust Litig., No. MDL 1261*,
   2004 WL 1221350 (E.D. Pa. 2004)....................................................................................39

*Los Angeles County Employees Retirement Association v. JPMorgan Chase & Co., et al.*,
   13 Civ. 7634 (S.D.N.Y.)........................................................................................................5

*Maley v. Dale Global Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)................................................................................32

*In re Marsh ERISA Litig.*,
   265 F.R.D. 128 (S.D.N.Y. 2010) ..................................................................21

*McDaniel v. Cty. of Schenectady*,
   595 F.3d 411 (2d Cir. 2010) ........................................................................32

*Meredith Corp. v. SESAC, LLC*,
   87 F. Supp. 3d 650 (S.D.N.Y. 2015) .......................................................22, 34

*Meijer, Inc. v. Barr Pharms., Inc.*,
   No. 05 Civ. 2195, Dkt. 210 (D.D.C. Apr. 20, 2009) ...................................40

*In re NASDAQ Market-Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) .................................................................26

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
   Civil Action No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) .....................32

*Nichols v. Smithkline Beecham Corp., No. CV A 00-6222*,
   2005 WL 950616 (E.D. Pa. Apr. 22, 2005) .................................................37

*In re Nortel Networks Corp. Sec. Litig.*,
   539 F.3d 129 (2d Cir. 2008) ........................................................................17

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   986 F. Supp. 2d 207 (E.D.N.Y. 2013) ........................................................29

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   991 F. Supp. 2d 437 (E.D.N.Y. 2014) .................................................*passim*

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983) .....................................................................................30

*In re Plastic Tableware Antitrust Litig.*,
   No. 94 CV 3564, 1995 WL 723175 (E.D. Pa. Dec. 4, 1995) .......................37

*In re RJR Nabisco, Inc. Sec. Litig.*,
   No. 88 Civ. 7905 (MBM), 1992 WL 210138 (S.D.N.Y. Aug. 24, 1992) .......32

*In re Rite Aid Sec. Litig.*,
   362 F. Supp. 2d 587 (E.D. Pa. 2005) ..........................................................32

*Salix Capital US Inc. v. Bank of America Corp., et al.*,
   13 Civ. 6116 (S.D.N.Y.) ................................................................................5

*Spann v. AOL Time Warner Inc.*,
   No 02 CV 8238 (DLC), 2005 WL 1330937 (S.D.N.Y. June 7, 2005) ...........37

*Steiner v. Am. B'casting Co.*,
   248 F. App'x 780, 783 (9th Cir. 2007) ........................................................32

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011) ........................................................................37

*In re Synthroid Marketing Litigation*,
  325 F.3d 974 (7th Cir. 2003) ...................................................................29

*In re Titanium Dioxide Antitrust Litig.*,
  No. 10-CV-00318 (RDB), 2013 WL 6577029 (D. Md. Dec. 13, 2013)...................39

*In re Visa Check/Mastermoney Antitrust Litig.*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................35

*In re Vitamin C. Antitrust Litig.*,
  No. 06 MD 1738, 2012 WL 5289514 (E.D.N.Y. Oct. 23, 2012) ...........................34

*In re Vitamins Antitrust Litig.*,
  No. 99 Mc. 197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) ....................20

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005)...............................................................19, 21, 24

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005).......................................................19, 30

*In re Worldcom, Inc. Sec. Litig.*,
  No. 02 Civ. 3288 (DLC), 2005 WL 2319118 (S.D.N.Y. Sept. 21, 2005) ...............17

*Yuzary v. HSBC Bank USA, N.A.*,
  No. 12 Civ. 3693 (PGG), 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013)...................32

## Statutes and Rules

Fed. R. Civ. P. 23(h) ...............................................................................1

## Miscellaneous

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.
  Empirical Legal Stud. 811, 839 tbl. 11 (2010) ...........................................20

Elliott J. Weiss, *The Lead Plaintiff Provisions of the PSLRA After A Decade, or "Look What's
  Happened to My Baby,"* 61 Vand. L. Rev. 543, 552-53 (2008) ...........................18

Jill E. Fisch, *Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel
  Under the PSLRA,* 64 Law & Contemp. Probs. 53, 92-93 (2001)...........................18

*Manual for Complex Litigation (Fourth)* § 14.121 (2004)...................................30

Michael A. Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public
  Pension Fund Participation in Securities Class Actions*, 9 J. Empirical Legal Studies 368
  (2012)...........................................................................................17

*Newberg on Class Actions* § 15:81 (5th ed. 2015) ......................................20, 39

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, Plaintiffs, through Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel") and Pearson, Simon & Warshaw LLP ("Pearson Simon," and, together with Quinn Emanuel, "Class Counsel"), respectfully move for an award of attorneys' fees, reimbursement of litigation expenses, and incentive payments to two named plaintiffs, all from the common fund established by Plaintiffs' settlements with Defendants.

## INTRODUCTION

As part of our preliminary approval papers, Plaintiffs explained why the settlement achieved here is a strong result for the class of investors in credit default swaps ("CDS").[1]  That conclusion was supported by the experienced mediator involved in this matter, Judge Weinstein (Ret.), who took the initiative to submit a declaration calling the result "exceptional," and "one of the best settlements I have witnessed in more than 30 years of mediating."[2]

Developments since October 2015 underscore this testimonial.  On December 4, 2015, the European Commission ("EC"), whose investigation of the CDS market led to the issuance of a Statement of Objections in the summer of 2013, announced it had *closed* its investigation of the Dealer Defendants.  The EC stated:

> The Commission has decided to close antitrust proceedings against all 13 investment banks involved in its investigation into the credit default swaps market . . . . Today's closure decision regarding the 13 investment banks is based on a thorough analysis of all information received from the parties in their replies and during the oral hearing of May 2014, as well as on documents obtained through additional

---

[1]  Dkt. No. 444.

[2]  *See* Declaration of the Honorable Daniel Weinstein (Ret.) in Support of Plaintiffs' Motion for Preliminary Approval of Settlement With All Defendants and Preliminary Certification of a Settlement Class ¶¶ 4, 28 (Oct. 16, 2015) (Dkt. No. 447) ("Weinstein Decl.").

> fact finding.  The evidence was not sufficiently conclusive to confirm the Commission's concerns with regards to the 13 investment banks.[3]

We respectfully disagree with the Commission's conclusion that there is not evidence "sufficiently conclusive" to prove the Dealer Defendants colluded to block exchange trading of CDS.  To the contrary, through the efforts detailed below, Plaintiffs built a compelling case that the banks did just that.  Nevertheless, that the EC reached the opposite conclusion underscores the significance of what Class Counsel achieved for the class and the magnitude of the risks Class Counsel faced – especially when litigating the case on a fully contingent basis.

Simply put, Class Counsel secured nearly $1.9 billion, along with meaningful injunctive relief, in a case in which neither the U.S. Department of Justice ("DOJ") nor the EC could make any charges stick.  As a result of our work, if the settlement is approved and the claims process proceeds on track, Class Counsel will deliver substantial monetary recoveries to investors in 2016.  Multiple claimants will likely recover millions of dollars, with many receiving millions or even tens of millions of dollars or more – an extraordinary result for class members in an antitrust action.  We believe the result here is historic not only in the total recovery, but also in the amounts being distributed per class member.

Class Counsel secured these results in the face of significant risks – risks far greater than those ordinarily faced in antitrust class actions.  As noted, Class Counsel could not rely, as many plaintiffs' counsel do, on government settlements, fines, or guilty pleas, or even on pressure arising from pending criminal charges.  And while Class Counsel litigated and met the significant funding demands of this case on their own, we faced a large array of many of the top

---

[3]   *European Commission – Daily News* (Dec. 4, 2015), http://europa.eu/rapid/press-release_MEX-15-6254_en.htm.  The EC noted that its investigation into the conduct of ISDA and Markit remains open.  The EC treated Bear Stearns, which was acquired by JPMorgan in 2008, as a separate bank for the purposes of its investigation, and thus it refers to "13" banks, as opposed to the 12 named Dealer Defendants in this action.

antitrust and trial lawyers in the defense bar, from seventeen law firms, representing fourteen defendants, and drawing upon the nearly limitless resources of the world's largest banks.

Advancing costs in a complex financial collusion case necessarily required Class Counsel to engage a number of experts and to task them with, among other things, analyzing huge volumes of data. As discussed further below, expert bills alone required Class Counsel to pay out-of-pocket over $9 million to litigate the case. Class Counsel advanced all of this money with no guarantee a single penny would ever be recovered.

The settlement will return money to an aggrieved class of investors relatively quickly for a complex case (approximately three years from its start). Continued litigation, on the other hand, could have led to diminishing returns. If Class Counsel had not agreed to accept the hard-fought settlement offers *before* the EC announced its decision to close its investigation of the Dealer Defendants, they may well have been emboldened to dig in and continue to fight. Had they done so, Class Counsel could have faced the possibility that, months or even years later, this Court, a jury, or an appellate panel would have reached the same conclusion as the EC – that the evidence was insufficient to prove collusion to block exchange trading.

When counsel take risks like this, and overcome substantial odds to secure such a strong result for the class, it is important that their work be compensated with a fair and reasonable fee. In this case, for the reasons detailed herein, a fair and reasonable fee for the plaintiffs' counsel in this case is approximately 13.61% of the monetary value of the settlement fund, or $253,758,000.

In addition to the many qualitative factors supporting this request, there is an independent, quantitative benchmark: the fee scale negotiated by the lead plaintiff, Los Angeles County Retirement Association ("LACERA"), at the outset of this matter. Reflecting its

sophistication and experience in complex litigation, LACERA negotiated with its counsel a graduated fee schedule whereby the percentage of allowable fees decreases as the amount of the common fund recovered increases.  Class Counsel's request here fully abides by the LACERA fee schedule and is thus presumptively reasonable.  *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 193 (2d Cir. 2007) ("[A] district court should consider the rate [a] reasonable, paying client would pay, and use that rate to calculate the presumptively reasonable fee.").  As discussed below, the request is also supported by this Circuit's standards for evaluating fee requests and by fee schedules adopted by other courts in other complex antitrust litigation.

Class Counsel also seek reimbursement for the substantial out-of-pocket expenses incurred by plaintiffs' counsel while prosecuting this action, amounting to approximately $9.391 million.  These expenses were all incurred for the class's benefit, and they were essential to the result achieved.  Class Counsel was incentivized to exercise careful judgment in incurring these expenses, because we were advancing them out of pocket.  These expenses are discussed below and in the declarations of Daniel L. Brockett and Bruce L. Simon submitted herewith.

Finally, Class Counsel also seek incentive awards for the two lead plaintiffs in this case, LACERA and Salix Capital US Inc. ("Salix").  This case presents a unique circumstance in which not only did these named plaintiffs incur significant time and expenses, but they also, particularly in the case of Salix, put their financial health and careers at great risk.  In these circumstances, a reasonable incentive award is appropriate to acknowledge the courage they displayed in being the face of a case alleging collusion by virtually all of the big Wall Street banks.

## THE WORK UNDERTAKEN BY CLASS COUNSEL

The results achieved for the class in this case are the product of years of hard work.  As this Court anticipated when appointing Quinn Emanuel as Lead Counsel for the proposed class, Class Counsel deployed a large number of "boots on the ground" to execute strategies set by senior members of the team who were experienced in financial and antitrust matters and in litigating against these large banking institutions.[4]  Quinn Emanuel was joined in this endeavor by Co-Lead Counsel, Pearson Simon, who devoted to this case a high percentage of its firm's resources, taking on great financial risk for the class's benefit.

### A.   Pre-Appointment Case Investigation and Initial Complaints

Following press reports of an investigation by the DOJ into the CDS market beginning as early as 2009, the EC announced on July 1, 2013, that it had sent a Statement of Objections to 13 investment banks, Markit, and ISDA concerning potential collusion to block exchanges from entering the CDS market.  Several plaintiffs filed cases in the spring and summer of 2013 making similar allegations.  Quinn Emanuel filed on August 29, 2013, and Pearson Simon filed on October 29, 2013.[5]

By the time of the filing of their respective cases, Quinn Emanuel and Pearson Simon had retained experts in derivatives and the CDS market to conduct the necessary economic analyses that would underpin the case.  They had also conducted a thorough analysis of publicly available materials.

---

[4]   *See* Transcript of Hearing at 49, 13 MD 2476 (Dec. 5, 2013) (Dkt. No. 244) (noting the importance of having "lots of boots on the ground" executing strategies of senior members of the team).

[5]   *See Salix Capital US Inc. v. Bank of America Corp., et al.*, 13 Civ. 6116 (S.D.N.Y.); *Los Angeles County Employees Retirement Association v. JPMorgan Chase & Co., et al.*, 13 Civ. 7634 (S.D.N.Y.).

B.      **Pleadings and Motions to Dismiss**

Following the appointment of Quinn Emanuel as Lead Counsel and Pearson Simon as

Co-Lead Counsel on December 13, 2013, the firms prepared a consolidated amended complaint.

Without the benefit of government indictments or guilty pleas,[6] Class Counsel scoured the public

record for facts probative of collusion and worked with experts to develop theories consistent

with the economic evidence.  Class Counsel also identified potential witnesses with knowledge

of the underlying facts.  Class Counsel met with numerous industry insiders, who provided

valuable insight into the operations of the CDS industry.

These efforts led to the filing of the Second Consolidated Amended Complaint (the

"Complaint"), in April 2014, which detailed in nearly 90 pages a conspiracy by Defendants to

stifle price competition and transparency in the CDS market, including an agreement to boycott

"CMDX," a proposed CDS exchange trading platform developed jointly by the Chicago

Mercantile Exchange ("CME") and Citadel Investment Group ("Citadel").  *See* Dkt. No. 285.

Defendants filed four separate motions to dismiss, totaling over 110-pages.  The Dealer

Defendants argued, *inter alia*, that the alleged injuries to class members were too remote to

provide the basis for an antitrust claim; the conspiracy allegations were implausible; the statute

of limitations barred certain claims; and the Dodd-Frank Wall Street Reform and Consumer

Protection Act ("Dodd-Frank") preempted the application of the antitrust laws to this case.  *See*

Dkt. No. 290.  ISDA argued its participation in the conspiracy was implausible because, as a

non-profit industry association, it would not have benefited from inflated bid-ask spreads caused

by the boycott of CDS exchange-trading platforms.  *See* Dkt. No. 298.

---

[6]   The EC's Statement of Objections, which it later withdrew, was a non-public
document unavailable to Class Counsel.

Markit argued that the Plaintiffs lacked antitrust standing, it was legally incapable of conspiring with its bank shareholders, and Plaintiffs had not alleged an unreasonable restraint of trade. *See* Dkt. No. 294. BNP Paribas argued that Plaintiffs had failed sufficiently to allege its role in the conspiracy. *See* Dkt. No. 296.

Class Counsel's omnibus opposition brief spanned nearly 100 pages. *See* Dkt. No. 307. In September 2014, the Court denied Defendants' motions, except for a single count for conspiracy to monopolize that was arguably superfluous given the conspiracy claims that were upheld. *See* Dkt. No. 321.

C. **Discovery Efforts**

Discovery began in earnest following the Court's order on Defendants' motions to dismiss. Class Counsel served extensive discovery requests on Defendants in September and October of 2014, and negotiated the production of documents previously provided by Defendants to the DOJ by the end of October 2014. Within six weeks of filing the parties' Joint Initial Report, Defendants had already produced millions of documents. After painstaking negotiations, in some cases with 14 different Defendants and stretching over many months, the parties agreed to search terms and custodians for additional productions. Defendants eventually produced over 50 million pages of documents.

Faced with this large volume of materials, Class Counsel employed an innovative discovery strategy that was critical in achieving the result in this case. Anticipating that the volume of documents produced by Defendants could be overwhelming, Class Counsel did everything possible to stay *ahead* of the curve, processing, analyzing, and assimilating the useful materials in Defendants' productions as quickly and efficiently as possible. The goal was to position Plaintiffs to begin taking effective depositions of Defendants' senior personnel before Defendants were fully prepared to defend them.

7

Executing this strategy required a tremendous upfront investment of resources.  Class Counsel trained a large team (key members of the proverbial "boots on the ground") to analyze the documents in an effective way, even before they started arriving.  Knowing we could not review every document immediately when it was produced (if at all), we used cutting-edge analytical tools to identify which categories of documents to review and the order in which we would review them.

Class Counsel reviewed thousands of documents per day, using what we learned on day one to inform which documents we would review on day two, and so on.  Important or "hot" documents were circulated and discussed daily among the attorneys.  As threads of the alleged conspiracy were uncovered, responsibility for mastering them was assigned to associates on the team.  Threads were developed in narrative form using a secure, internal website maintained by Class Counsel that enabled real-time team-wide distribution and analyses of documents and work product.  The proprietary knowledge-sharing tools we used in this case directly contributed to the speed and efficiency by which Class Counsel were able to learn key elements of the case.[7]

By the end of 2014, Class Counsel had created a detailed, multi-year, and multi-layered chronology of the alleged conspiracy and had identified many of the key witnesses.  This work product was crucial for the initial round of depositions.  It allowed us to master the topics on which we were deposing senior officers at the banks and led to several important admissions that we believe contributed to the settlement.

Plaintiffs began serving interrogatories on November 21, 2014, including requests for information about the dates and attendees of potentially conspiratorial meetings.  It took months

---

[7]  Those internal tracking and digestion processes led to Class Counsel's ability to present a credible liability case at the mediation session held on January 22, 2015, supported by a fully developed brief citing dozens of defendants' documents.  *See* Weinstein Decl. at 5.

of negotiations (and threats of motion practice) before Defendants provided meaningful answers disclosing dates, times, and names, rather than just a list of objections and document references. Knowing exactly who met with whom, and when and where, helped Plaintiffs further target their analyses of Defendants' massive document productions and piece together the details of key conspiratorial meetings.

We also served subpoenas on approximately two dozen third parties. For example, Class Counsel sought and obtained data for tens of millions of CDS transactions from the Depository Trust & Clearing Corporation ("DTCC"), which became the backbone for the damages model Class Counsel built with our experts (and is now the backbone of the claims process).[8] Because of its sheer volume and complexity, processing the DTCC data required a dedicated, full-time team of experts – discussed in further detail in the Declaration of Elizabeth Kroger Davis. Plaintiffs also obtained document productions from key third parties, including CME, the Intercontinental Exchange ("ICE"), and Citadel, which, like Defendants, had previously produced documents to the DOJ.

Class Counsel also ensured that Plaintiffs met their own discovery obligations, producing hundreds of thousands of pages of trading data and responsive emails, and responding to interrogatories served by defendants on January 12, 2015. LACERA worked with its investment advisors to produce detailed trading records for its CDS transactions. Salix produced trading records, emails, and other relevant documents, including documents located overseas that required extensive efforts to recover and produce before Plaintiffs' deadline for substantial completion of document production.

---

[8]   Counsel for DTCC informed Co-Lead Counsel when it produced the full DTCC CDS trade database that is was the largest data production DTCC had ever made to an outside party. Declaration of Bruce L. Simon, ¶ 9 ("Simon Decl.").

Class Counsel also oversaw the efforts of other plaintiffs' counsel in the case.  On December 13, 2013, the Court instructed Quinn Emanuel that it could request Court approval, on an *ex parte* basis, to utilize other counsel for particular legal tasks to assist the case.  Dkt. No. 247.  On October 6, 2014, the Court approved Class Counsel's request to authorize three law firms representing four named plaintiffs to perform certain specified tasks under Class Counsel's supervision.  Dkt. No. 343 (endorsed *ex parte* letter filed under seal).  Those firms were Entwistle & Cappucci LLP, Labaton Sucharow LLP, and The Mehdi Firm, PC.[9]  Following that date, Class Counsel oversaw the efforts of Entwistle & Cappucci LLP and Labaton Sucharow LLP (together, "Associated Counsel") in connection with their clients responding to discovery requests and performing other tasks consistent with the Court's order.

At a January 2015 hearing, the Court suggested that the parties expedite the schedule for class certification, and the deadline for Plaintiffs' motion was advanced by six months.[10] Plaintiffs considered this accelerated schedule a benefit.  We had *already* created a detailed chronology of Defendants' conspiracy, had *already* identified the key witnesses to depose and the types of admissions to secure, and were eager to present Plaintiffs' case for class certification.

This was true despite Defendants opposing Class Counsel about the scope of their document productions, with the result that many banks had not completed their productions by May 2015.  Class Counsel decided the best way forward to was to keep the pressure on.

---

[9]   The Mehdi Firm's client later withdrew as a named plaintiff because it could not meet its discovery obligations.  Accordingly, Class Counsel have not included any time and expenses for that firm in this application.

[10]   *See* Transcript of Hearing at 27, 13 MD 2476 (Jan. 22, 2015) (Dkt. No. 384); Revised Pretrial Scheduling Order, 13 MD 2476 (Feb. 2, 2015) (Dkt. No. 388).

Depositions would proceed even without a complete set of Defendants' documents, and the class certification schedule would not move.

Accordingly, Class Counsel noticed 21 fact depositions on May 27, 2015.  Depositions began on June 10, 2015, and continued at a breakneck pace through August, with as many as four depositions being taken on a single day (sometimes in multiple countries).  These depositions were largely of senior bank personnel, including one Defendant's head of credit trading and Chief Financial Officer of its investment bank, another Defendant's former Chief Executive Officer, and the leader of one Defendant's strategic investments group.

All told, Class Counsel served thirty-four formal deposition notices on Defendants, requested dates for dozens more witnesses, and took twenty-seven depositions of defense witnesses.  Class Counsel also noticed depositions of third parties Bloomberg, CME, Citadel, and the CEO of ICE.  Defendants, on the other hand, did not notice or take *a single deposition* before the case settled.  This stark contrast speaks to the large and efficient effort by Class Counsel to advance the case.

The depositions taken by Class Counsel were generally taken by seasoned examiners with experience in this complex subject matter.  As a result of these cumulative efforts, Plaintiffs believe that virtually every deposition led to damaging admissions and blows to the credibility of Defendants' witnesses.  This was despite the fact that Defendants' witnesses were, uniformly, well-prepared by their able counsel.

### D.  Expert Work and Class Certification Preparation

While depositions were proceeding, Class Counsel worked with multiple experts to build a rigorous class-wide approach to proving injury and quantifying damages.

1.     _Impact and Damages Analysis by BRG_

We retained Berkeley Research Group ("BRG"), a world-renowned data analytics and economic consulting firm with expertise in derivatives and financial markets.  BRG was tasked with analyzing from an economic and financial standpoint certain propositions central to the case.  As detailed more fully in the declaration of Elizabeth Kroger Davis, Class Counsel worked with BRG to develop a working model for class-wide impact and damages based on actual data regarding CDS transactions engaged in by class members.[11]  Key elements of this model are now being used to administer the claims process so each class member receives its _pro rata_ share of the settlement proceeds.

Plaintiffs' model primarily (but not exclusively) utilized two data sources:  data regarding executed CDS transactions from third party DTCC and data regarding daily CDS pricing quotes from defendant Markit.  DTCC, essentially a market utility for the financial services industry, contains an extensive warehouse of trade information regarding confirmed CDS trades.  Class Counsel served a subpoena on DTCC on October 16, 2014, in order to ensure its data was produced as quickly as possible.  To gain a fuller understanding of the DTCC data, we insisted that Defendants produce descriptions of the data that they themselves sent to DTCC.  While Defendants objected to this request, they ultimately complied and identified the data fields they reported to DTCC in February 2015.

Because the DTCC only recorded _executed_ CDS transactions, it was not a repository of the bid-ask spread charged on CDS transactions.  Accordingly, Plaintiffs also sought CDS quote data in order to determine the exact impact of Defendants' conspiracy on each CDS transaction by a class member.

---

[11]   _See_ Declaration of Elizabeth Kroger Davis ¶¶ 5-12.

Defendant Markit captures CDS quotes published by the Dealer Defendants on a daily basis, and these quotes provide a reasonable basis for calculating the bid-ask spread for individual CDS transactions.  As part of its initial production in October 2014, which was essentially the same documents it had previously produced to the DOJ, Markit produced some of this data.  But, because the DOJ investigation sought only data through 2011, the quotes initially produced to Plaintiffs covered less than half of the class period.  Plaintiffs sought additional data from Markit.  Markit strenuously resisted this (along with practically every other discovery request by Plaintiffs), and it required months of effort, and the threat of involving the Court, for Plaintiffs to obtain this critical information.

Meanwhile, BRG, in close consultation with Class Counsel, engaged in a massive effort to analyze the DTCC and Markit data – an effort that, to some degree, continues today as part of the claims process.  As noted, the DTCC data covered every CDS transaction executed over the class period, and DTCC retains 200 individual data fields for each transaction, meaning BRG had to deal with tens of millions of individual data points.  Many of the DTCC fields were indecipherable without reference to a "data dictionary," which also had to be obtained from DTCC in order to decode the information.  Markit's data was similarly complex and voluminous. Markit recorded the date, time, and dealer contributor for millions of CDS quotes over the class period, and also provided a measure of quote quality (on a scale of 0 to 10) based on a proprietary algorithm developed by Markit.

These two massive datasets – the DTCC database and the Markit quote database – provided the foundation for Plaintiffs' economic damages model.

In consultation with Class Counsel and industry consultants, BRG identified and removed transactions from the DTCC database that were not impacted by Defendants' conspiracy.  Once

the DTCC data had been filtered to exclude non-qualifying transactions, BRG cross-referenced it with the Markit quote data to estimate the bid-ask spread on every individual transaction executed by a class member.  BRG did this by using the time-stamped Markit quotes to divide the quotes for each CDS contract into hourly intervals, identifying the smallest bid-ask spread from these hourly intervals, and then averaging that number over the course of the day to arrive at a reasonable estimate of the bid-ask spread on each CDS contract for a given day.  BRG then matched the quotes for a given CDS with the DTCC data using the contract's reference entity, tenor, and trade date.  For the narrow set of dates for which Markit quotes did not provide sufficient information to estimate a bid-ask spread, BRG developed an algorithm that searched for the nearest bid-ask spread for an identical or similar CDS within 15 days of the date of the missing bid-ask spread.

Finally, with an estimated bid-ask spread for each executed CDS in the DTCC database, the last step was to apply a spread compression measure to the trade to determine the damages suffered by a given class member on the day of the trade.  To arrive at this measure, BRG conducted a review of the literature on bid-ask spread compression, drawing both on empirical studies from other financial products that had transitioned from over-the-counter ("OTC") to exchange-traded markets, as well as on recent third-party analyses of the CDS market.

The result of this Herculean effort was a credible model capable of calculating, on a formulaic basis, the damages suffered by *every* class member on *every* CDS trade throughout the class period.  Class Counsel had a preliminary version of this model up and running as early as March 2015.  In fact, Class Counsel were so confident in the preliminary model they disclosed it in its entirety, along with a written description, to Defendants as part of the mediation process.

       2.     *Professor Darrell Duffie*

Class Counsel also retained Darrell Duffie, Ph.D., the Dean Witter Distinguished Professor of Finance at Stanford University.  Professor Duffie is widely recognized as one of the world's leading experts on OTC markets for financial products, including CDS.  We retained Professor Duffie to testify on, among other things, the viability of a CDS exchange, the compression of bid/ask spreads on an exchange, and the impact of blocking exchange trading on CDS investors.  Class Counsel worked closely with Professor Duffie early in the litigation to develop theories on the compression of bid/ask spreads and the viability of a CDS exchange. And Class Counsel continued to work closely with Professor Duffie over the course of the litigation to better understand the CDS market, as well as OTC markets in general.

At the time of settlement, Professor Duffie was nearly finished with a lengthy report addressing, *inter alia*, how Defendants' alleged conspiracy had a common adverse impact on the class.  In connection with this work, Professor Duffie reviewed hundreds of documents and numerous deposition transcripts, and conducted an extensive survey of publicly available literature.  Professor Duffie's report concluded that Defendants' conspiracy had harmed all or virtually all members of the class.

       3.     *Other Experts*

Class Counsel retained a number of other industry experts as well, to ensure that Plaintiffs were as informed about the market as Defendants.  These included a former CDS trader at one of the leading banks who provided crucial insight into the CDS market, and helped counsel prepare rebuttals to Defendants' anticipated arguments against certification, many of which were foreshadowed by defense counsel at a January 22, 2015 conference.  We also consulted with Dan Donovan and others at Salix, who provided valuable insights into the CDS market from their decades of experience trading CDS.

For example, Class Counsel knew Defendants would oppose class certification by arguing that CDS trades were not sufficiently standardized to support class-wide litigation and that Class members had not suffered a common impact from the alleged conspiracy.  Counsel worked closely with the industry expert to unpack and dismantle this argument, and were close to finishing an expert report on these issues when the case settled.  Counsel worked closely with several other industry and data consultants as well to master the many issues raised by the case.

### E.      Mediation Strategy and Settlement

Finally, Class Counsel engaged in extensive and proactive mediation efforts which ultimately led to the settlement of this matter.  The mediation process, timeline, and work conducted in connection therewith was described in Plaintiffs' Motion for Preliminary Approval (*see* Dkt. No. 444, at 14-16), which Plaintiffs hereby incorporate by reference.  Plaintiffs also incorporate by reference the declaration of mediator Judge Weinstein (Ret.) (Dkt. No. 447), which further describes the work done in connection with this process.  As Judge Weinstein (Ret.) noted, the work done by Class Counsel, in his view, resulted in a settlement that was "exceedingly favorable and reflects a recovery well beyond what I expected could be achieved during much of the mediation process."  Weinstein Decl. ¶ 29.

### ARGUMENT

## I.      CLASS COUNSEL'S FEE REQUEST IS FAIR AND REASONABLE

### A.      The Request is Consistent with the Fee Scale Negotiated by LACERA

In awarding attorneys' fees, a district court should consider "what a reasonable, paying client would be willing to pay," while taking into account "the complexity and difficulty of the case," "the resources required to prosecute the case effectively," "the timing demands of the case," and the attorneys' interest in "achieving the ends of the litigation."  *Arbor Hill*, 522 F.3d at 184.  Here, the most straightforward measure for determining "what a reasonable, paying

client would be willing to pay" is what the lead plaintiff – LACERA – *agreed* to pay in a retainer agreement negotiated at the outset of this matter.

LACERA is a sophisticated investor that undertook a competitive bidding process for selecting counsel, negotiated counsel's fee, and was actively involved in overseeing every aspect of the litigation.  As Michael Herrera explains in his declaration, LACERA issued a Request for Proposal ("RFP") to several law firms, selected Pearson Simon as counsel, and negotiated at arm's-length a fair and reasonable fee arrangement drawing upon its experience in complex litigation.  Declaration of Michael Herrera ¶¶ 5-11 ("Herrera Decl.").  The fee schedule is set forth in the engagement agreement between LACERA and Pearson Simon.  *See id.*; *see also* Simon Decl. ¶ 6.  The LACERA fee agreement calculates fees based on a percentage of the recovery for the class, as well as the point at which a settlement or judgment was obtained.  Herrera Decl. ¶¶ 8-9.  The fee request here – 13.61% of the common fund – is fully consistent with that agreement.  *Id.*

LACERA's *ex ante* judgment about an appropriate attorney's fee for this matter should be given "great weight."  *In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2005 WL 2319118, at *31 (S.D.N.Y. Sept. 21, 2005).  As the Second Circuit has noted in the context of litigation governed by the Private Securities Litigation Reform Act, district courts should "give serious consideration to negotiated fees because [] lead plaintiffs often have a significant financial stake in the settlement, providing a powerful incentive to ensure that any fees resulting from that settlement are reasonable."  *In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133-34 (2d Cir. 2008); *cf. In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) (fee agreements between class counsel and the lead plaintiff enjoy "a presumption of reasonableness").

17

Because of their substantial stakes, sophistication, and status as repeat players in large

litigation, plaintiffs like LACERA "are particularly well suited to monitor plaintiffs' counsel and

to negotiate sophisticated compensation agreements that reduce legal fees and minimize agency

costs." Jill E. Fisch, *Aggregation, Auctions, and Other Developments in the Selection of Lead*

*Counsel Under the PSLRA*, 64 Law & Contemp. Probs. 53, 92-93 (2001).[12]

Although this antitrust case is not subject to the PSLRA, these considerations strongly

support Class Counsel's fee request. As a sophisticated and motivated lead plaintiff, LACERA

negotiated Class Counsel's fee *ex ante*, which "is the best indication of the actual market value

of counsel's services." *In re Comverse Tech., Inc. Sec. Litig.*, No. 06 Civ. 1825 (NGG), 2010

WL 2653354, at *4 (E.D.N.Y. June 24, 2010); *see also In re Cardinal Health Inc. Sec.*

*Litigations*, 528 F. Supp. 2d 752, 758 (S.D. Ohio 2007) (observing that an *ex ante* fee

arrangement avoids "hindsight bias" and better "align[s] the interests of the class and the

attorneys throughout the litigation").

LACERA was actively consulted throughout the litigation, and was involved in

discovery, the mediation, and settlement discussions. It also supports the fee request based on its

active monitoring of Class Counsel's work and the results counsel achieved. During the course

of the litigation, Mr. Herrera "reviewed all significant pleadings and responses to discovery,"

---

[12] Empirical research confirms that cases led by large institutional investors with negotiated fee arrangements produce larger settlements and, at the same time, lower attorneys' fees awards. *See* Michael A. Perino, *Institutional Activism Through Litigation: An Empirical Analysis of Public Pension Fund Participation in Securities Class Actions*, 9 J. Empirical Legal Studies 368 (2012) (finding, based on an analysis of 731 pre- and post-PSLRA settlements, that "[c]ases with public pension fund lead plaintiffs settle for greater amounts" and "[a]t the same time, attorneys' fee requests and the fees courts ultimately award are significantly lower"); Elliott J. Weiss, *The Lead Plaintiff Provisions of the PSLRA After A Decade, or "Look What's Happened to My Baby,"* 61 Vand. L. Rev. 543, 552-53 (2008) (finding "institutional investors . . . have negotiated fee arrangements with the law firms they have retained that provide for percentage fees far lower than had been the norm prior to passage of the PSLRA").

received regular updates as to the status of the litigation, and attended nearly every mediation session either in-person or via teleconference.  Herrera Decl.  ¶¶ 11-16.

Consequently, LACERA has a more intimate sense of the strengths and weaknesses of Plaintiffs' case than can be conveyed through briefing papers.  Its *ex ante* agreement on fees and its *ex post* endorsement of Class's Counsel's fee request is highly probative of the fair and reasonable nature of the fee request here.

### B.   Class Counsel's Request is Well Within the Range Used Under the Second Circuit's Preferred Percentage-Based Methodology

The reasonableness of the requested fee is confirmed by other court decisions applying the "percentage method" of fee calculation, which is the test favored in this Circuit.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method"); *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005) (same).  The percentage method provides "appropriate financial incentives" necessary "to attract well-qualified plaintiffs' counsel who are able to take a case to trial," while also "directly align[ing] interests of the class and its counsel" by providing "a powerful incentive for the efficient prosecution and early resolution of litigation."  *Id*.  "[I]n the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation."  *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775 (JG), 2011 WL 2909162, at *6 (E.D.N.Y. July 15, 2011) (quoting *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973)).

The fee request for plaintiffs' counsel here totals 13.61% of the common fund, which is on its face reasonable.  It also falls squarely within the range of fees found to be reasonable by courts in this Circuit and elsewhere.  As this Court has noted, "attorney's fees of one-third or less

of the settlement amount are customarily found to be reasonable." *Donoghue v. Morgan Stanley High Yield Fund*, No. 10 Civ. 3131 (DLC), 2012 WL 6097654, at *2 (S.D.N.Y. Dec. 7, 2012) (collecting cases). "Even in large-value cases, courts have sometimes awarded contingency fees exceeding 30% of the overall fund." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 447 n.11 (E.D.N.Y. 2014) (collecting cases).

The request here is less than half of 30%, and it is fully consistent with awards in other large antitrust cases. *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775 (JG), 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012), 2011 WL 2909162 (E.D.N.Y. July 15, 2011), 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) (aggregate fee award of 25% across three settlements totaling $422.2 million); *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) (fee award of 20% with $956 million settlement); *In re (Bank of Am.) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) (fee award of 30% with $410 million settlement); *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (fee award of 33.3% with $510 million settlement); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (fee award of 31.33% with $1.06 billion settlement); *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) (fee award of 21.4% with $455 million settlement); *In re Vitamins Antitrust Litig.*, No. 99 Mc. 197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) (fee award of 34.06% with $365 million settlement).[13]

---

[13]   *See also* Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839 tbl. 11 (2010) (in 2006-07, mean of fee awards in federal class actions using the percentage-of-the-fund method where funds ranged from $1 to $6.6 billion was 13.7%); *Newberg on Class Actions* § 15:81 (5th ed. 2015) (same).

**C.**      **The Requested Fees Are Appropriate Under the *Goldberger* Factors**

The requested fee award is also supported by the application of the six-factor standard set forth in *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000).  Under that standard, courts weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations."  *Id.* at 50.

         1.      *The Risk of the Litigation*

"The most important *Goldberger* factor is often the case's risk."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at  440; *see also Goldberger*, 209 F.3d at 54 (noting that risk is "perhaps the foremost factor to be considered in determining whether to award an enhancement") (internal citations and quotations omitted).

"Risk is not uniform in all class actions" and for "certain antitrust class actions filed in the wake of a Department of Justice consent decree . . . . the risk is limited."  *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 147 (S.D.N.Y. 2010).  The risk here was relatively high for a number of reasons:

- To quote a memorable metaphor, "this is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own."  *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992).  Class Counsel did not have the benefit of government indictments, consent decrees, or guilty pleas.  Quite the opposite:  just as the Court was appointing lead counsel in this case, news reports emerged that the DOJ was closing its investigation into the CDS market.  *See Wal-Mart Stores, Inc.*, 396 F.3d at 122 (noting risk that "plaintiffs' counsel did not have the benefit of 'piggybacking' off of a previous case"); *In re*

21

*Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at
441 (observing case was "unusually risky" because "plaintiffs did not piggyback on
previous government action").

- Class Counsel faced the risks associated with taking on twelve massive banks, with
virtually unlimited resources and the ability to fight this case for years at the trial and
appellate level.  *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 670
(S.D.N.Y. 2015) (noting the substantial risk associated with antitrust litigation which
is likely to be "lengthy and hard-fought").

- Class Counsel's legal theories faced many risks, many of which were stated in the
press and argued or at least identified in Defendants' motions to dismiss and
mediation briefing.  Those included that CDS exchange trading failed because CDS
were not standardized; the buy-side lacked interest in trading platforms; CMDX
experienced its own technical problems; and the Dealer Defendants did not support
CMDX in 2008 and 2009 because "the financial markets were in a state of crisis" and
the banks, which were "concerned about their very survival," "hardly could be
expected to devote substantial attention and resources to developing a new and
untested method of trading."  Dkt. No. 290 at 3.

- There was also the specific risk that Class Counsel would be unable to prove
collusion by the Defendants.  As noted, the DOJ reportedly closed its investigation
after four years of looking at the CDS market.  And the EC's recent conclusion after
years of investigation that it was unable to find sufficient evidence to prove bank
collusion, in particular, highlights the gravity of the risk.

- When the litigation began in 2013, no court had ruled on the extent to which Dodd-Frank preempted antitrust claims concerning derivative trading, and Defendants argued that Second Circuit precedent was not in Plaintiffs' favor. This argument had the potential to severely limit the available pool of damages.

- There were also risks associated with establishing a class-wide damages model. Unlike a more traditional price-fixing case, Plaintiffs' case relied on proving what prices would have been in a hypothetical world where a competitive entrant was not blocked. Defendants argued from the outset that such an effort would be too speculative to support a damages award. Defendants also took the position that damages could not be calculated on a class-wide basis because each CDS transaction is unique. At the parties' mediation, Defendants heavily criticized Plaintiffs' damages model and would have undoubtedly attacked it at class certification and trial with the support of an army of top-flight experts. *See In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) (noting that "uncertain" damages and issues pending regarding class certification "were significant risks remaining in this litigation").

Class Counsel took this case on a fully contingent basis, expending thousands of hours of effort over nearly three years in spite of the possibility that we might never be compensated. "Counsel should be rewarded for undertaking [those risks] and for achieving substantial value for the class." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 441. "If not for [Class Counsels'] willingness to endure for many years the risk that their . . . efforts would go uncompensated, the settlement would not exist" and an "award of attorneys' fees must recognize that, from an *ex ante* perspective . . . ." *Id.*; *see also Jermyn v.*

23

*Best Buy Stores, L.P.*, No. 08 Civ. 214 (CM), 2012 WL 2505644, at *10 (S.D.N.Y. June 27, 2012) ("[T]he risk of non-payment in cases prosecuted on a contingency basis where claims are not successful . . . can justify higher fees.").

      2.    *Complexity of the Case*

While "antitrust cases, by their nature, are highly complex," *Wal-Mart*, 396 F.3d at 122, each of the aforementioned risks built an added layer of complexity into this case. This was not a case about fixing the price of widgets. It involved a less common theory of liability – a group boycott of emerging market entrants. Class Counsel had to litigate issues of antitrust standing, preemption by Dodd-Frank, tolling of the statute of limitations, and the scope of recent Supreme Court decisions relating to liability in joint venture contexts. *See* Dkt. Nos. 290, 294.

The nature of this case also demanded that Class Counsel master the intricacies of complex financial products and derivatives trading in order to muster proof, take depositions, build a damages model, and brief class certification motions. The conspiracy involved fourteen Defendants, and occurred over a span of six years, making the scope of the case daunting. *See Wal-Mart*, 396 F.3d at 122 (noting the case was "especially large and complicated," even for an antitrust case, where it involved "almost every U.S. bank" and millions of class members).

Given the number of Defendants, all of which are banks or financial services firms; the duration, intricacy, and international nature of the conspiracy; the complexity of the financial products at issue; and the considerable erudition of opposing counsel, the sophistication and challenges involved in litigating this matter far exceed that of most antitrust matters. Accordingly, a fee award that accounts for the prosecution of litigation that was "extraordinary in both complexity and scope" is appropriate. *In re Holocaust Victim Assets Litig.*, No. 06 CV 0983 (FB), 2007 WL 805768, at *46 (E.D.N.Y. Mar. 15, 2007).

3.        *Quality of Representation and Time Spent by Counsel*

"[T]he quality of representation . . . may be measured in large part by the results that

counsel achieved for the classes."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust*

*Litig.*, 991 F. Supp. 2d at 441.  As detailed in Plaintiffs' Motion for Preliminary Approval, Class

Counsel obtained nearly $1.9 billion in settlements, with some individual claimants expected to

recover tens of millions of dollars (or more).  As Judge Weinstein (Ret.) noted, the work done by

Class Counsel, in his view, resulted in a settlement that was "exceedingly favorable and reflects

a recovery well beyond what I expected could be achieved during much of the mediation

process."  Weinstein Decl. ¶ 29.

Beyond this monetary recovery, Class Counsel secured injunctive relief that will promote

competition in the CDS market.  Defendant ISDA has agreed to make changes in its licensing

process that should make it much easier for new market entrants to launch CDS trading

platforms.  The changes should also make ISDA meetings and decision-making processes more

transparent.[14]

In fact, the CDS market has finally begun to evolve toward exchange trading.  In August

2015, shortly after Plaintiffs had reached settlements with all Defendants, the Intercontinental

Exchange ("ICE") announced it was launching an all-to-all CDS exchange-trading platform.[15]

ICE's announcement is particularly noteworthy because, in 2008, the Defendants allegedly

---

[14]    In addition, continuing these reforms, Defendant ISDA has recently announced that it
has expanded its Board of Directors to include "members from diverse sectors of the market"
and revised its mission statement to "to ensure the Association's strategic priorities reflect
changing market dynamics and the primary concerns of members."  *See ISDA Announces*
*Expansion of Board of Directors and Updates Strategy Statement*, Business Wire (Jan. 12,
2016), http://www.businesswire.com/news/home/20160112006280/en/ISDA-Announces-
Expansion-Board-Directors-Updates-Strategy.

[15]    *See* Mike Kentz, *ICE plans single-name CDS platform*, Reuters (Aug. 31, 2015),
http://www.reuters.com/article/2015/08/31/markets-derivatives-cds-idUKL1N1161A520150831.

conspired to *prevent* ICE from doing exactly this.  That ICE has apparently broken free of Defendants' control and decided to launch a competition-enhancing platform indicates that the CDS market is moving in the right direction.  The spotlight turned on Defendants' conduct by Class Counsel in this litigation almost certainly played a role.

Obtaining this injunctive relief and prompting market reforms, while not necessarily quantifiable, are further testaments to the quality of Class Counsel's representation.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d at 442 (securing injunctive relief "reinforces [the] judgment that plaintiffs' counsel litigated the case with skill and tenacity, as would be expected to achieve such a result"); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 388 (S.D.N.Y. 2005) (finding injunctive relief relevant to determining percentage of common fund that should be awarded as attorneys' fees).  Class Counsel's ability to obtain these recoveries from these defendants is further testament to the quality of representation in this case.  *See In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving 14 percent fee award of $1 billion fund where defense counsel included "the nation's biggest and best defense firms operating on a seemingly unlimited budget over a period of four years").

The quality of Counsel's representation is also evident from the amount of time and resources spent on the case.  Class Counsel met the challenge of litigating against fourteen defendants by employing a strategy that required the efficient deployment of a large amount of resources.  To do so, Class Counsel drew upon over one hundred sixty attorneys and support personnel who collectively billed nearly 92,000 hours.  The case at hand was massive, with over fifty million pages of documents to be analyzed by Class Counsel, and Class Counsel brought sufficient resources to the case to litigate it properly.

As reflected in the chart below, Class Counsel ramped up staffing at appropriate times in the case – after the motions to dismiss were decided and especially when taking dozens of depositions.  At other parts of the case, staffing was kept at reasonable levels.[16]



These facts highlight Class Counsel's significant yet efficient dedication of resources and attorney time, and they further justify the requested fee.

> 4.   *The Fee is Reasonable in Relation to the Settlement*

In assessing the requested fee in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, Judge John Gleeson of the Eastern District of New York surveyed attorneys' fee awards and identified "legal principles" or "guideposts" for evaluating fee requests in large-value antitrust cases.  991 F. Supp. 2d at 443-44.  While every case is different, such guideposts reduce "unwarranted disparities in outcomes" and provide predictability for counsel. *Id.* at 446-47.

---

[16]   This chart does not incorporate the time spent on the case by Associated Counsel which, as noted above, was principally spent on discovery efforts related to their clients.

Judge Gleeson observed that the "starting point for assessing the requested fee in relation to the settlement fund is large class cases with court-set fees." *Id.* at 443. As noted above, the 13.61% fee request here is in line with (and even on the low side of) awards in other mega-fund and large antitrust cases. Judge Gleeson further concluded that a *graduated* fee schedule (that is, with fee percentages declining as the common fund increases) was appropriate for awarding fees in such cases. Such "a graduated schedule permits a more reasoned and transparent calculation of the lawyers' fee based on comparison to other cases." *Id.* at 445. It also "implicitly acknowledges and addresses a worry many courts, including the *Goldberger* court, have expressed, *i.e.*, that 'it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case.'" *Id.* (quoting *Goldberger*, 209 F.3d at 52).

Based on the awards in other large cases, and "tak[ing] some inspiration from [two] empirical studies," *id.* at 446, Judge Gleeson proposed the following graduated fee schedule:

| Bracket | *In re Interchange Fee* "Schedule" Fee Percentage | Marginal Fee |
|---|---|---|
| $0 - $10 million | 33% | $3.3 million |
| $10 - $50 million | 30% | $12 million |
| $50 - $100 million | 25% | $12.5 million |
| $100 - $500 million | 20% | $80 million |
| $500 million - $1 billion | 15% | $75 million |
| $1 - $2 billion | 10% | $100 million |
| $2 - $4 billion | 8% | $160 million |
| $4 – $5.7 billion | 6% | $102 million |

It is important to note that the two right-hand columns in this chart are *marginal*. Under this marginal fee schedule, "counsel are awarded 33% of the fund up to $10 million . . . 30% of the next $40 million . . . 25% of the next $50 million . . . 20% of the next $400 million . . . 15%

of the following $500 million; 10% of the following $1 billion; 8% of the following $2 billion; and 6% of the remainder. . . ."  *Id.* at 445.[17]

Judge Gleeson's fee schedule was "tailored . . . to the unique facts and circumstances" of the case.  *Id.* at 447.[18]  Applying that fee schedule to this case would yield a fee percentage of 14.42%, or about 0.8% **higher** than the 13.61% requested by Class Counsel.

| Bracket | *In re Payment* "Schedule" Fee Percentage | Marginal Fee |
|---|---|---|
| $0 - $10 million | 33% | $3.3 million |
| $10 - $50 million | 30% | $12 million |
| $50 - $100 million | 25% | $12.5 million |
| $100 - $500 million | 20% | $80 million |
| $500 million - $1 billion | 15% | $75 million |
| $1 - $1.86565 billion | 10% | $86.5 million |
| | | |
| **TOTAL:** | 14.42% (average) | $269.4 million (total fee) |

It is a testament to LACERA's sophistication and savvy that the fee schedule it negotiated *ex ante* is consistent with, if somewhat more conservative than, the fee schedule adopted by Judge Gleeson based on his survey of the case law and the literature.  This further

---

[17]   This graduated schedule is a revision of the sliding scale endorsed by the Seventh Circuit in *In re Synthroid Marketing Litigation*, 325 F.3d 974, 980 (7th Cir. 2003) (approving award in which class counsel received 30% of the first $10 million, 25% of the next $10 million, 22% of the band from $20 to $46 million, and 15% of everything beyond $46 million).

[18]   There are a number of differences between the settlement in this case and the settlement of the *Interchange Fee Litigation*, at least some of which make the award here all the more appropriate.  The settlement in that matter faced a striking level of opposition from named plaintiffs and absent class members alike.  In fact, a *majority* of the named plaintiffs (ten out of nineteen) objected to the settlement and opposed its approval.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 986 F. Supp. 2d 207, 223  (E.D.N.Y. 2013); *id.* at 217 ("Some of the merchant plaintiffs who directly participated in the lengthy settlement discussions and initially agreed to the terms of the settlement broke away and objected, as they were entitled to do.  Numerous other members of the merchant class have objected as well, on a variety of grounds.").  Among other things, the objectors argued that the release agreed to by class counsel violates the Due Process Clause by forcing a release of antitrust claims, including future claims for individualized monetary damages, upon members of a mandatory settlement class.  That issue, and related issues about the settlement and the release, are pending before the Second Circuit.

confirms that the fee request here is reasonable both in terms of the percentage fee that was

negotiated *ex ante* and the fee percentages awarded in similar cases.

5. *Public Policy Considerations*

Public policy strongly supports the requested fee award.  Without private counsel taking

on the risk of this lawsuit, the class here – over 13,000 entities – would have recovered ***zero***

dollars, and the CDS market may still be frozen in time.  This case is thus a prime example of

why public policy favors enforcement of the antitrust laws through suits by private attorneys

general.  *See Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983) (emphasizing "the

importance of the private action as a means of furthering the policy goals of certain

federal regulatory statutes, including the federal antitrust laws").

Awarding a reasonable percentage of the common fund ensures zealous enforcement of

the law and incentivizes skilled counsel – including at firms with large, diverse practices, like

Quinn Emanuel, and more specialized firms of high quality, like Pearson Simon – to bring cases

even where, at the outset, the prospect of any recovery is uncertain.  *See In re WorldCom*, 388 F.

Supp. 2d at 359 ("In order to attract well-qualified plaintiffs' counsel who are able to take a case

to trial, and who defendants understand are able and willing to do so, it is necessary to provide

appropriate financial incentives.").

The result here was also accomplished expeditiously, allowing "class members to recover

without unnecessary delay" and allowing "the judicial system to focus resources elsewhere."  *See

Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 474-75 (S.D.N.Y. 2013); *see also Bano v. Union

Carbide Corp.*, 273 F.3d 120, 129-30 (2d Cir. 2001) (public policy favors the resolution of class

actions through settlement).  An advantage of the percentage method of calculating attorneys'

fees is that it incentivizes, rather than *discourages*, such efficient resolutions.  *See Manual for

Complex Litigation (Fourth)* § 14.121 (2004) ("[O]ne purpose of the percentage method is to

encourage early settlement by not penalizing efficient counsel, thus ensuring that competent counsel continue to be willing to undertake risky, complex, and novel litigation.").

Accordingly, the public policy factor weighs heavily in favor of Class Counsel's requested fee.

### D.    The Lodestar Cross-Check Supports The Requested Fee

The lodestar fee calculation method has "fallen out of favor particularly because it encourages bill-padding and discourages early settlements." *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014). At most, the lodestar method should be used as a cross-check to ensure the award here is not an "unwarranted windfall." *Goldberger*, 209 F.3d at 49-50. There is no windfall here.

Class Counsel collectively billed nearly 92,000 hours to this matter. At customary rates, and applying the rates in existence at the time the work was undertaken, these hours translate into approximately $39,878,772 in total lodestar as of January 1, 2016.[19] Class Counsel's request for $253,758,000 in attorneys' fees for plaintiffs' counsel thus represents a total multiplier of approximately 6.36.[20]

---

[19]   "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Goldberger*, 209 F.3d at 50.

[20]   Class Counsel have reviewed the time records submitted by Associated Counsel. As a conservative measure, Class Counsel have determined that each firm (Entwistle & Cappucci and Labaton Sucharow) incurred approximately $400,000 in lodestar. Given the limited scope of those firms' work, Class Counsel have not included this lodestar in the numbers reported above, for cross-check purposes. If that time was included, the total lodestar would be $40,678,772.50 and the multiplier would be 6.24. Associated Counsel's fees will be paid out of the total fees awarded by the Court in proportion to their respective contribution to the case, in the judgment of Class Counsel.

This multiplier is squarely within the range awarded by courts in this District, as well as across the country.[21] *See, e.g.*, *Beckman*, 293 F.R.D. at 481-82 ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Asare v. Change Grp. of N.Y., Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar."); *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (CM), 2014 WL 1883494, at *13 (S.D.N.Y. May 9, 2014) (noting that "lodestar multiples of over 4 are awarded by this Court"); *Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) (describing as "modest" a "fair and reasonable" 4.65 multiple); *In re RJR Nabisco, Inc. Sec. Litig.,* No. 88 Civ. 7905 (MBM), 1992 WL 210138, at *6-8 (S.D.N.Y. Aug. 24, 1992) (awarding multiplier of 6).[22]

In this case, even a higher multiplier may well be justifiable given the factors discussed above, and especially the level of risk.[23]  *See, e.g.*, *McDaniel v. Cty. of Schenectady*, 595 F.3d 411, 424 (2d Cir. 2010) ("The level of risk associated with litigation . . . is 'perhaps the foremost factor' to be considered in assessing the propriety of a multiplier….").

---

[21]   Class Counsel continued to devote time to the claims administration process during January 2016, and anticipates doing so through at least May 27, 2016, the last day for class members to submit claims.  To the extent this occurs, it will reduce Class Counsel's lodestar multiplier.

[22]   *See also Steiner v. Am. B'casting Co.*, 248 F. App'x 780, 783 (9th Cir. 2007) (multiplier of 6.85 "falls well within the range of multipliers that courts have allowed"); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, Civil Action No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (multiplier of 8.3); *In re Rite Aid Sec. Litig.*, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (multiplier of 6.96).

[23]   *See Detroit v. Grinnell Corp.,* 495 F.2d 448, 470 (2d Cir. 1974) ("No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.  Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended."), *abrogated on other grounds by Goldberger*, 209 F.3d 43; *In re Am. Bank Note Holographies, Inc. Sec. Litig.*, 127 F. Supp. 2d 418, 433 (S.D.N.Y. 2001) (it is "appropriate to take this [contingent fee] risk into account in determining the appropriate fee to award").

To reduce Class Counsel's award because it achieved strong results sooner and perhaps more efficiently than otherwise could have been done would send the exactly wrong message. Rather, as recognized in *Yuzary v. HSBC Bank USA, N.A.*, No. 12 Civ. 3693 (PGG), 2013 WL 5492998 (S.D.N.Y. Oct. 2, 2013), approval of an upper-range (there, 7.6) multiplier is proper because courts should not limit fee awards in a way that "penaliz[es] plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial." *Id.* at *11; *see also Beckman*, 293 F.R.D. at 482 (awarding 6.3 multiplier to avoid "penalizing plaintiffs' counsel for achieving an early settlement, particular where, as here, the settlement amount is substantial").

The settlement here occurred only after very significant discovery, and hard fought depositions of senior executives, and with Class Counsel having nearly completed their voluminous papers supporting their motion for class certification. As noted, however, Class Counsel believe the timing was right. It is difficult to know whether the Dealer Defendants would have paid nearly $1.9 billion to settle this case *after* they were effectively cleared by the EC. If Class Counsel had continued to litigate this matter for another several months, increasing their lodestar, the result could have been a dramatically *reduced* recovery for the class. Class Counsel should be rewarded – and certainly not penalized – for their judgment to settle the case when they did, as well as for their success in the face of great risk.

E.    **The Reaction of the Class Supports the Fee**

Finally, the preliminary reaction of class members to the settlement and Class Counsel's fee request, which was disclosed in the Notice mailed on January 11, 2016, confirms the reasonableness of the request.[24]   *See In re High-Crush Partners L.P. Sec. Litig.*, No. 12 Civ.

---

[24]   In fact, Class Members were informed that Class Counsel may seek a fee of up to 14%, with the actual fee request being somewhat lower.

8557 (CM), 2014 WL 7323417, at *18 (S.D.N.Y. Dec. 18, 2014) ("In addition to the criteria set

forth in *Goldberger*, courts in the Second Circuit consider the reaction of the class to the fee

request in deciding how large a fee to award.").  While class members still have time to file

objections to the fee request, none have currently done so.[25]

## II.   CLASS COUNSEL'S EXPENSES ARE REASONABLE

"Counsel are entitled to be reimbursed for the reasonable expenses advanced in class

litigation."  *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 469 (S.D.N.Y. 2004);

*see also In re Vitamin C. Antitrust Litig.*, No. 06 MD 1738, 2012 WL 5289514, at *11 (E.D.N.Y.

Oct. 23, 2012) ("Courts in the Second Circuit normally grant expense requests in common fund

cases as a matter of course.") (citations and internal quotes omitted).  As detailed in the

declaration of Daniel L. Brockett, $9,391,241.49 of expenses have been incurred by Class

Counsel.  As also described in the Brockett Declaration, $94,394.96 unreimbursed expenses were

incurred by Associated Counsel.

For the reasons discussed above, "substantial expenses were necessary in this complex

antitrust case."  *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d at 671 (reimbursing over $4

million in expenses).  The lion's share of Class Counsel's expenses ($7,577,925.07) are for

"professional services," the billing category that includes Plaintiffs' experts, most of which

($5,401,634.89 ) are attributed to the work of BRG.  As described above in the background

Section D.1 and in the Declaration of Elizabeth Kroger Davis, BRG engaged in a massive effort

to build a sophisticated damages model based on millions of data points for one of the most

complicated and opaque financial markets in the world.  This work became, if anything, more

---

[25]   Class Counsel will update the Court on the reaction on the class on or prior to April 8,
2016, the last day to file reply papers in support of Class Counsel's petition for fees and
expenses.  *See* Dkt. No. 465 (Order granting preliminary approval of Settlements and setting
schedule for final approval).

labor-intensive after the case settled, as BRG has developed an executable model for estimating the inflated spread paid by every class member on every CDS transaction as part of the claims process.  Additional work by BRG was also necessary as a result of extending the class period by nearly 21 months.

In addition to finalizing the work they had begun for class certification, Class Counsel and BRG *also* had to engage in a painstaking examination of *all* of the trades conducted by class members to ensure that they qualified for damages under the Settlements.  This work was rigorous and time-consuming and is still ongoing.  Aside from BRG, the remainder of Class Counsel's expert expenses are composed of fees paid to Professor Darrell Duffie and his assistants, Plaintiffs' industry expert, Plaintiffs' DTCC consultant, and other specialized consultants.  Class Counsel have reviewed the invoices from these experts – as we would for any paying client – and found them to be reasonable.

The balance of Class Counsel's expenses are composed of industry-standard charges such as online legal research, document imaging and copying, deposition transcription and videotaping, travel expenses, other litigation support services, and mediation fees.  These expenses, too, have been reviewed by Class Counsel and were found to be reasonable.  In fact, to be conservative in this fee application, Class Counsel have voluntarily made substantial reductions to several expense categories.[26]  There is thus "no reason to depart from the common practice in this circuit of granting expense requests."  *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) (granting $18.7 million expense request where bulk of expenses were "experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses").

---

[26]  *See* Brockett Decl. at 15; Simon Decl. ¶ 34.

In terms of ongoing expenses, we expect BRG to continue to perform important work supporting the claims process.  We will continue to monitor its work and review its invoices before making such payments out-of-pocket.  We will then seek at an appropriate future time Court approval for these additional out-of-pocket, ongoing expenses, which are not accounted for in the above figures because they have not yet been incurred.[27]

Finally, Class Counsel has retained Garden City Group, LLC as the Settlement Administrator to send notice to the class and to administer the claims process.  In accordance with the settlement terms and the Court's preliminary approval order,[28] Garden City Group, LLC will submit its invoices – following Class Counsel's review and approval – directly to the escrow agent for payment from the common fund on a regular basis.  To date, we have received invoices for a total of $276,261.80 for services rendered through December 31, 2015.  We have reviewed those invoices and found them to be reasonable.

## III.   INCENTIVE AWARDS ARE APPROPRIATE

Finally, Class Counsel seek an incentive award for class representatives LACERA and Salix, both to compensate them for the time they devoted to this case and to reward them for standing up to a very powerful group of Wall Street banks.  Class Counsel appreciate the opportunity to explain why this case may be an appropriate exception to the Court's general practice of not granting incentive awards.

LACERA and Salix did not just put their names on this lawsuit; they made invaluable contributions that will help return substantial compensation to fellow market participants.  Their

---

[27]   We do not currently foresee incurring any other major expenses, excluding ongoing claims administration expenses, moving forward, but reserve the right to seek reimbursement should they be incurred.

[28]   Dkt. No. 465.

work – over 1000 hours total – was a driving force behind the successful resolution of this case and warrants financial compensation.[29]

Messers. Donovan, Felgner, and Grannan from Salix worked with Class Counsel to build this case from the beginning, contributing valuable knowledge from their years of experience trading CDS and other financial products.  As noted above, Mr. Donovan helped Plaintiffs' experts build their damages model, and all three Salix representatives worked closely with Class Counsel to respond to the more difficult causation and damages-related arguments raised by Defendants.  They did all this while meeting their discovery obligations, including producing hundreds of thousands of pages of documents and responding to detailed interrogatories.  In total, they spent over 400 hours on this case.  Had these Salix personnel been compensated at market rates (which, for seasoned financial consultants, routinely top $600/hour), they would have earned approximately $240,000.

LACERA joined this case because it has "a strong interest in ensuring that financial markets are transparent and free of fraud and collusion," and went to great lengths to ensure that the lawsuit was prosecuted vigorously and efficiently.[30]  *See* Herrera Decl. ¶¶ 11-16, 19.  As

---

[29]  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775, 2015 WL 5918273, at *5 (E.D.N.Y. Oct. 9, 2015) (approving awards of $540,000 total where "class representatives expended a significant amount of time and incurred substantial burdens in assisting with this litigation"); *Spann v. AOL Time Warner Inc.*, No 02 CV 8238 (DLC), 2005 WL 1330937, at *9 (S.D.N.Y. June 7, 2005) (Cote, J.) ("[A]n incentive award may be given to compensate named plaintiffs for efforts expended for the benefit of the lawsuit."); *Nichols v. Smithkline Beecham Corp.*, No. CV A 00–6222, 2005 WL 950616, at *24 (E.D. Pa. Apr. 22, 2005) (appropriate to compensate named plaintiffs with incentive awards "where they have actively assisted plaintiffs' counsel in their prosecution of the litigation for the benefit of a class").

[30]  It is well-recognized that named plaintiffs may be granted incentive awards "as a reward for public service and for the conferring of a benefit on the entire class." *In re Plastic Tableware Antitrust Litig.*, No. 94 CV 3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995); *see also Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (affirming incentive

37

explained by Mr. Herrera, LACERA engaged in arm's-length negotiations with Pearson Simon

to ensure its fee arrangement was competitive and in the best interests of the class.  After the

initiation of the case, LACERA was closely involved in written discovery and mediation

sessions.  Mr. Herrera participated actively in each of the numerous mediation sessions and gave

a compelling oral presentation at one mediation session that helped demonstrate the power of

LACERA's potential testimony at any trial.  In total, Mr. Herrera and his colleagues contributed

over 600 hours to this lawsuit.  *See id.* ¶ 16.

    In addition to this substantial expenditure of time, this was truly a case where stepping

forward put plaintiffs at financial risk.  It is a well-known fact that those in the financial industry

fear retaliation by Wall Street banks against those who oppose their interests.[31]  Such retaliation

may manifest itself in tangible ways:  denial of employment opportunities, refusals to trade, and

other actions which make it impossible for those who end up blacklisted to survive in the

financial industry.  And it also may amount to a proverbial death by a thousand cuts that is

effectively impossible to prove.

    As explained in the Declaration of Thomas Felgner (Salix), Plaintiffs here knew that by

commencing this lawsuit, they were putting a target on their backs, and would likely never work

in any job that required interacting closely with the Dealer Defendants again.  Declaration of

Thomas Felgner ("Felgner Decl.") ¶ 9.  Mr. Felgner, for example, was denied an employment

---

awards in antitrust case and noting that "[t]he purpose of these payments is to . . . reward the
public service of contributing to the enforcement of mandatory laws").

    [31]  *See, e.g.*, Karen Bretell, *Banks' pressure stalls opening of U.S. derivatives trading
platform*, REUTERS (Aug. 27, 2014) ("Several hedge fund managers that had planned to join [an
anonymous CDS trading platform] received phone calls from multiple banks that indicated that
they would stop trading with them or send them unfavorable pricing" [if they did so].");  *see also*
Transcript of Hearing at 32 13 MD 2476 (Jan. 22, 2015) (Dkt. No. 384) ("given the nature of the
business relationships and the marketplace realities here, there is an inherent pressure that I can't
shut my eyes to").

opportunity at one of the Dealer Defendants during this lawsuit.  *Id.* ¶ 10.  As Mr. Donovan, who

is currently self-employed, put it:  "Agreeing to serve as a class representative in this case thus,

in my mind, essentially ended my employment prospects with the sell-side banks, including the

major dealers of CDS."  Donovan Decl. ¶ 3.  Moreover, as explained by Mr. Felgner, because

many firms are dependent on the Dealer Defendants for their day-to-day activities, taking on this

case meant that the Salix principals – all identified by name to Defendants during discovery –

had to forego opportunities at buy-side firms, such a hedge-funds, as well.  Incentive awards are

warranted in situations where the cost of participation for class representatives is prohibitively

high for most, to ensure future plaintiffs are willing to step forward.[32]

　　　　Class Counsel thus respectfully request that the Court award incentive payments in the

amount of $200,000 to LACERA and $193,700 to Salix.[33]  The requested incentive awards are

appropriate for an antitrust case of this magnitude given the time expended and the risks

involved.  *See, e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5918273, at *6

(granting $540,000 in incentive awards out of total settlement of approximately $330 million)*; In

re Titanium Dioxide Antitrust Litig.*, No. 10–CV–00318 (RDB), 2013 WL 6577029, at *1 (D.

Md. Dec. 13, 2013) (awarding class representative $125,000 out of $163.5 million settlement);

---

[32]　*See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5918273, at *5
(approving incentive awards in antitrust case where "class representatives conceivably put their
businesses in risk of potential retaliation" by defendants); *In re Linerboard Antitrust Litig.*, No.
MDL 1261, 2004 WL 1221350, at *18 (E.D. Pa. 2004) (incentive award "particularly
appropriate" because "taking a high-profile role threatened to jeopardize class representatives
relationships with their suppliers"); *Newberg on Class Actions* § 17:3 (5th ed. 2015) (collecting
cases for proposition that "[c]ourts often premise incentive awards on the risks that the class
representatives undertook in stepping forward to represent the class," including the risk that "a
class representative might face retaliation").

[33]　Because Daniel Donovan was compensated in the amount of $6,300 for a small
portion of his consulting work in connection with this case, this amount has been subtracted from
the total incentive payment sought for named class representative Salix.  *See* Declaration of
Daniel Donovan ¶ 13 ("Donovan Decl.").

*Meijer, Inc. v. Barr Pharms., Inc.*, No. 05 Civ. 2195, Dkt. 210 ¶ 17 (D.D.C. Apr. 20, 2009) (awarding $50,000 to each of five representatives with $22 million settlement).

The awards requested here are much smaller than the recoveries many class members will receive and will certainly not make LACERA and Salix's total recoveries disproportionate to other class members.  *See In re Air Cargo Shipping Servs. Antitrust Litig.*, 2015 WL 5918273, at *6 (finding incentive awards reasonable where they were "reasonably proportionate to the average recovery class members will receive").  In fact, as explained in the Declaration of Thomas Felgner, Salix itself will likely keep *nothing* for its claims in this case because, under its assignment agreement with the FrontPoint Funds, all of the money it receives from the claims process will flow to investors in the FrontPoint Funds.  Felgner Decl. ¶ 19.  While Messers. Donovan, Felgner, and Grannan may each receive a *de minimis* amount through their small remaining ownership stakes in one of the FrontPoint Funds, without an incentive award, Salix and its principals will likely recover next to nothing for the risk and time they devoted to the case.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court approve Plaintiffs' application for attorneys' fees and costs and incentive awards in the amounts set forth above. Plaintiffs will submit a Proposed Order in connection with its later filing, on or before April 8, 2016, which will include the specific figures requested and current information as of that date.

DATED:   New York, New York          QUINN EMANUEL URQUHART &
         January 29, 2016                SULLIVAN, LLP


                                     By:  /s/ Daniel L. Brockett
                                     Daniel L. Brockett
                                     Steig D. Olson
                                     Sascha N. Rand
                                     Jonathan Oblak
                                     51 Madison Avenue, 22nd Floor
                                     New York, New York 10010
                                     Telephone:  (212) 849-7000
                                     Fax:  (212) 849-7100
                                     danbrockett@quinnemanuel.com
                                     steigolson@quinnemanuel.com
                                     sascharand@quinnemanuel.com
                                     jonoblak@quinnemanuel.com

                                     Jeremy D. Andersen
                                     865 S. Figueroa St., 10th Floor
                                     Los Angeles, CA 90017
                                     Telephone :  (213) 443-3000
                                     Fax :  (213) 443-3100
                                     jeremyandersen@quinnemanuel.com

                                     *Lead Counsel for Plaintiffs*

                                     PEARSON, SIMON & WARSHAW, LLP

                                     By:  /s/ Bruce L. Simon
                                     Bruce L. Simon
                                     Clifford Pearson
                                     George S. Trevor
                                     44 Montgomery Street, Suite 2450
                                     San Francisco, California 94104
                                     Telephone: (415) 433-9000
                                     Fax: (415) 433-9008
                                     bsimon@pswlaw.com
                                     cpearson@pswlaw.com
                                     gtrevor@pswlaw.com

                                     *Co-Lead Counsel for Plaintiffs*

41